### AUSTIN C. DUNHAM AND OTHERS, EXECUTORS, *vs.* JAMES P. AVERILL AND OTHERS.

A testator gave a legacy to "The American & Foreign Bible Society." It appeared that there was an incorporated society of that name for the distribution of the Bible, established and mainly supported by the Baptist denomination; and another, incorporated earlier for the same general purpose, named "The American Bible Society," which was mainly supported by the Congregational and Presbyterian denominations. The latter society was sometimes called "The American & Foreign Bible Society," but there was no evidence that it was as well known by that name as the other society, and none that the testator had ever called it or heard it called by that name. Both societies were in the habit of soliciting contributions for their work from the neighborhood where the testator lived. The testator's denominational associations and preferences were wholly with the Congregationalists and he had no special sympathy with the Baptist denomination. Held that evidence was not admissible, upon a claim of the American Bible Society to the legacy, that while the will was being drawn the testator said to the scrivener that he wished to give the money to the Bible society sustained by the Congregationalists and Presbyterians; that he was not sure as to its corporate name, but believed it to be "The American & Foreign Bible Society."

The name used in the will being perfectly descriptive and plainly written, and there being nothing in the will to suggest any different intention from that expressed, the court would not be warranted in intermeddling, even though satisfied that the testator did in fact make a mistake.

The testator gave a legacy to "The American & Foreign Missionary Society." There was no missionary society of that name, but "The American Board of Commissioners for Foreign Missions" was a long established incorporated society for the purpose of carrying the gospel to heathen lands, was supported by persons belonging to the Congregational order, and had received annual contributions from the Congregational society of which the testator was a member, and he had been a liberal contributor to its funds. No other society carrying on the same work was connected with the Congregational order in the state, and this society was frequently called, in the vicinity where the testator lived, by the name used in the will. Held that the American Board of Commissioners for Foreign Missions was entitled to the legacy.

Where a name used in a devise or legacy as that of a corporation does not designate with precision any corporation, but circumstances concur to indicate that a particular one was intended, and no conclusive circumstances appear to distinguish or identify any other, the one thus shown to be intended will take.

The testator bequeathed to the Hartford Hospital a reversionary interest in certain sums given to sundry persons as annuities, and in another section of the will certain lands in Ohio. By a codicil made a few months later he revoked "all devises in said will beneficial to the Hartford Hospital," and made a new bequest of $5,000. The Hartford Hospital, for the purpose of showing that the bequest of the annuity money was not intended to be revoked, offered evidence to prove that the lawyer who drew the will, afterwards and before the codicil was drawn, informed him that by the law of Ohio a bequest or devise to a corporation made within twelve months before the death of the testator was void, and that another lawyer who drew the codicil, on being informed of the facts with regard to the devise of the Ohio land, asked the testator if that was all he had given the hospital, and he replied that it was. The court below found, if this evidence was admissible, that while the testator intended to revoke all provision made in his will for the Hartford Hospital, and to substitute therefor the legacy of $5,000, yet he did not at the time have in mind the fact that he had made a bequest of the annuity money to the hospital, and his attention was directed only to the devise of the Ohio land. Held that the evidence was not admissible.

Where a testator by a codicil revokes a devise or legacy, and grounds such revocation on the assumption of a fact which proves not to exist, the revocation is regarded as contingent upon the existence of such fact and does not take effect.

But the courts will not set aside such a revocation where it does not appear by the will itself that it was made under the belief of the existence of such fact.

The bequest to the Hartford Hospital of the reversionary interest in the annuity money, was to create a fund of which the interest should be paid out to persons discharged from the hospital, who should be destitute and worthy of aid. The revocation in the codicil was "of all devises *beneficial* to the Hartford Hospital." Held that the bequest, though for the direct benefit of persons leaving the hospital, was yet to be regarded as beneficial to the hospital.

The testator gave to *A* a legacy of $3,000. The will was made in 1874. In 1872 the testator had given *A* $3,000, and taken from him the following receipt: "Oct. 1, 1872. Received of *J. R.* three thousand dollars in anticipation and ·discharge of any legacy bequeathed to me by said *R* by his will of prior date." Held that the payment of the $3,000 did not constitute an advancement on account of the legacy given by the will of 1874, the receipt limiting its application to a will of prior date.

And when the testator upon having his will re-drafted chose to renew the legacy to *A* given by such prior will, he was to be presumed to have done so in view of all the facts.

PETITION IN EQUITY, by the executors of James Root, for advice as to the proper construction of his will; brought to the Superior Court in Hartford County, and reserved, upon facts found, for the advice of this court. The case is fully stated in the opinion.

*J. C. Parsons,* for the executors.

*R. D. Hubbard,* for Laura B. Dunham, residuary legatee and devisee.

*C. E. Perkins,* for J. P. Averill.

*L. E. Stanton,* for the American & Foreign Bible Society.

*L. P. Waldo* and *A. P. Hyde,* for the American Bible Society and the American Board of Commissioners for Foreign Missions.

*H. C. Robinson,* for the Hartford Hospital.

PARDEE, J. James Root, of Hartford, died on the 17th day of April, 1875, having made a will upon the 14th day of July, 1874. Austin C. Dunham and John C. Parsons, of Hartford, and Loren Prentiss, of Ohio, who were named therein as executors, have brought their petition to the Superior Court, in which they say that two corporations, to wit, the American Bible Society and the American and Foreign Bible Society claim the same legacy; that the corporation known as the Hartford Hospital claims to be entitled to a legacy under the tenth clause of the will, whereas the executors are of opinion that the same was revoked by a clause in

the codicil; that a corporation known as the American Board of Commissioners for Foreign Missions claims that a legacy given to the American and Foreign Missionary Society was intended for themselves; and that they are in doubt as to their duty in respect to a legacy given to James P. Averill; and they have asked the Superior Court for instructions as to their duty in the premises; and that court has reserved the several questions for the advice of this court.

*First*—as to the question between the American Bible Society and the American and Foreign Bible Society.

The clause in the will upon which this question arises, is as follows:

"*Eleventh.* I give and devise to the American Home Missionary Society, five thousand dollars; to the American and Foreign Missionary Society, three thousand dollars; to the American and Foreign Bible Society, fifteen hundred dollars; to the American Seaman's Friend Society, five thousand dollars; and to the Children's Aid Society of the Five Points, New York, three thousand dollars."

A society chartered and organized for the distribution of the Bible, and bearing the name of The American and Foreign Bible Society was made a respondent and filed an answer setting forth its claims to the legacy. Another society chartered and organized for substantially the same purpose, and bearing the name of The American Bible Society, was also made a respondent, and filed an answer claiming the legacy to have been intended for itself.

On the trial before the court below of the issue formed by the answers of the American Bible Society and the American and Foreign Bible Society, the American Bible Society offered evidence to prove the following allegations in its answer, to wit:

1st.    That the American Bible Society has been and is known by the following names and designations, to wit:— The American Bible Society, The American Bible Society for Foreign Distribution, and The American and Foreign Bible Society.

2d.    That while the scrivener was engaged drawing the

will in question, Mr. Root said to him that he wished to give to the Bible Society sustained by the Presbyterians and Congregationalists the sum of fifteen hundred dollars; that he was not sure as to its corporate name, but believed it to be the American and Foreign Bible Society; and that this name was used by the testator as and for the name of this respondent, and that it is descriptive of the character and objects of this association and the work it was constituted to perform.

3d. That Mr. Root, the testator, in his life-time, was a regular attendant on public worship at the churches and religious meetings of the Congregational order, and was never in especial sympathy with any church or society of the Baptist denomination.

4th. That the legacy in the eleventh clause of the will, being a gift of the sum of fifteen hundred dollars to the American and Foreign Bible Society, was intended by the testator to be and is a gift to the American Bible Society.

The American Bible Society claimed that this evidence was admissible to show that the name, the American and Foreign Bible Society, was inserted in this will by mistake and inadvertence, and that it was the intention of the testator to give this legacy to the American Bible Society. The counsel for the American and Foreign Bible. Society, claiming, and the claim being admitted, that there was no other corporation of this name, objected to the admission of this evidence on the ground that it was not competent for the American Bible Society to prove that this legacy was intended for it by any other evidence than the will itself. The counsel for the American and Foreign Bible Society also objected, that if any evidence was admissible to show that the American Bible Society has been known or called by any name other than its. corporate name, it can only be allowed to show in this proceeding that it is as well known by the name of the American and Foreign Bible Society as by any other name, or at least as well known by said name as is the respondent, whose corporate name is the American and Foreign Bible Society.

The testator had resided in, and in the vicinity of Hartford, and had been a regular attendant upon public worship in

churches of the Congregational order, and had never been in especial sympathy with any church or society of the Baptist denomination. The American and Foreign Bible Society was incorporated in 1848 by the legislature of the state of New York for, and is engaged in the work of, circulating the Bible in all lands; it is managed by persons connected with the Baptist denomination; and in their answer they say that they were well known by their said corporate name to, and received contributions from, Congregationalists and Presbyterians residing in all parts of the state of Connecticut, long before the date of the testator's will.

The American Bible Society received their act of incorporation from the legislature of the state of New York in 1841, for, and are now carrying into effect, the like purpose of circulating the Bible at home and abroad; they have been and still are supported by churches and individuals of the Congregational order in all parts of the state of Connecticut; and the court finds that they were known by the following names and designations, viz: "The American Bible Society," "The American Bible Society for Foreign Distribution," and "The American and Foreign Bible Society;" and their offer is to prove that while the scrivener was drawing the will the testator said to him that he wished to give to the Bible society sustained by the Presbyterians and Congregationalists the sum of fifteen hundred dollars; that he was not sure as to its corporate name, but believed it to be the American and Foreign Bible Society; and that this name was used by the testator as and for the name of the American Bible Society, and that it is descriptive of the character and objects of this association and the work it was organized to perform.

It is quite certain that the testator desired to promote the circulation of the Bible; that the contesting corporations are both engaged in that work substantially in the same field; and that both were known to, and drew their support from, persons, societies and churches interested in their respective undertakings, in the places of the testator's residence. We may say of them as of individuals, that each had its residence and was known in his vicinity.

It is to be observed that there is no offer of proof that he had ever spoken of, or had heard any person speak of, or had himself ever known either of the two societies by any other than their respective corporate names; none that he had ever in speech or writing substituted one name for the other, either by mistake or intentionally for convenience; none that the American Bible Society was or is as well or as widely known by the name of the American and Foreign Bible Society as is the society whose name by right it is.

We are of course to presume that he was in full possession of his mental faculties; the finding shows that no person misled him by making a false statement; he heard no suggestion even; his mind was upon the subject and the resultant name declared and directed by himself stands written as the "American and Foreign Bible Society."

We have then two corporations practically residing in the neighborhood of the testator, each doing that which he desired to have done, and the name of one of them is plainly written in his will as a legatee. There would seem to be here that certainty which under the rules of law defies any attempt to control or vary the language. The offer is to prove an intention not suggested by any expression or provision in the will, and not apparent when we look at the names of corporations circulating the Bible. It is a proposition to strike out a name which is perfectly descriptive.

In view of the facts found by the court and of the relation which these corporations have to each other and to the testator, admitting that he made a mistake, yet the law will not permit the court to intermeddle; it insists that what he has so plainly written shall stand as the best proof of his thoughts at the moment.

And, although one of the fundamental canons of interpretation requires courts to discover and be led by the intention of the maker of an instrument, that intention in the case of a testator is judicially determined to be simply what he has written, if his language be clear and precise and the person or thing exist and be accurately named. In *Tucker* v. *Seamen's Aid Society*, 7 Met., 188, it is said that "the general

Dunham *v.* Averill.

rule certainly is that the intent of the testator is to govern in the construction; but it is the intention expressed by the will and not otherwise." In *Gwillim* v. *Gwillim*, 5 Barn. & Ad., 122, Parke, J., said that "in expounding a will the court is to ascertain, not what the testator actually intended, as contradistinguished from what his words express, but what is the meaning of the words he has used." In *Beaumont* v. *Field*, 2 Chitty's Rep., 275, Abbott, C. J., said the question was not abstractly, what was the meaning of the grantor, but what was his meaning by the words used.

The highest and best evidence is always to be sought for; and when a man deliberately puts his intention in writing under testamentary safeguards, and carefully preserves that writing for the guidance of those who represent him after his death, courts regard it as revealing his thoughts and intents with more accuracy than would any parol declarations which extrinsic evidence could substitute for it. Under any other rule that which might come at last to be accepted as the will would be not what the testator wrote, but what others have said since his death; indeed, he being silent, the rule is the sole support and defence of a will where there are disappointed heirs or legatees.

The rule of law governing this case is, that it is only where, in a will, the description of the person or thing intended is applicable with equal certainty to each of several subjects, that extrinsic evidence, including proof of the testator's declarations as to his intentions made at the time of drawing the will, is admissible for the purpose of establishing which of such persons or things was intended by him. The words of the will must be such as to render it a matter of necessity to have recourse to extrinsic evidence to explain them; if no such necessity exists, the evidence is not admissible.

Persons who desire to make testamentary disposition of their estates other than that made for them by the statute of distribution, are required to call about themselves several attesting witnesses and to speak and act in accordance with precise and solemn forms, in order to guard against the entrance of fraud, deception or mistake into their work. And

the courts supporting the statute have persistently and with a good degree of unanimity refused admission to parol evidence of the kind offered in this case, either to contradict, add to, take from, or explain, the contents of a will so clear as to the legatee as is the one before us, even when the failure of an intended disposition is the result of such refusal.

In *Avery* v. *Chappel*, 6 Conn., 270, the testator said in his will as follows: "And it is my will that Charles W. Chappel should have the whole of my landed property after the marriage or decease of his honored mother." Upon the re-marriage of the widow the guardian of Charles W. brought an action of ejectment against her and her husband; thereupon the latter prayed for an injunction against that action and asked for a decree quieting the petitioners in the possession and use of the real estate until Charles W. should arrive at full age. They offered proof that before, at, and after the making of the will, the testator told his wife that the use of the whole real estate would be and by his will was hers until their children should arrive at full age; that he gave directions to the scrivener so to write it as to give his wife the use of all his real estate until the children should arrive at full age; and that the scrivener wrote it as he did by mistake. In the opinion the court says (p. 276): "The proof offered by the plaintiffs was parol evidence only. Upon these facts, with our statute of wills and the solemnities required by it in view, it is certainly difficult to interpose for the relief of the plaintiffs. The court is asked to take from the devisee, the principal object of the testator's bounty, the possession of this estate for a long period, in opposition to the true construction of the will, by parol proof of the declarations of the deceased that he intended to give it to his wife; in other words, to make a will for him when he sleeps in his grave. Strong reasons should be urged in support of a claim so novel, and so forbidding. * * It was decided in the highest court in South Carolina, after much discussion and deliberation, that parol evidence, even of the person who drew. the will and who was of unimpeachable character, when offered to support the allegation of a mistake in the will and that the

testator intended to dispose of the property in a manner not apparent on the face of the will, was not admissible. *Roth-maler* v. *Myers*, 4 Dessaus., 215. Where there is a complete and plain will in writing, it cannot be altered or influenced by parol evidence as to the intention. 2 P. Wms., 421. Evidence as to matter *dehors* the will to ,show the mistake is insufficient. 2 Atk., 373. Even the instructions for the will are inadmissible to show a mistake. 2 Ves. & Bea., 318; 1 Mad. Chan., 81."

In *Comstock* v. *Hadlyme*, 8 Conn., 254, it was admitted that the testatrix gave directions to the scrivener to insert in her will a legacy of $100 to each of the appellants, they being her only heirs at law, and that by mistake of the scrivener the amount of the legacy was omitted, and that she signed and published the will supposing it to contain those legacies. In the course of the opinion declaring that this mistake did not invalidate the will, WILLIAMS, J., says as follows: "The statute, when it required all wills to be in writing signed by the testator and attested by witnesses, certainly intended that the evidence and the whole evidence of the disposition of property by will, should be by the will itself; that the evidence of the intent of the devisor should be derived from the writing signed by him and solemnly attested; otherwise innumerable would be the cases where evidence of mistake would be claimed and proved.    *    *    . And if it is settled that you cannot by parol proof alter the legal import of the terms used by the scrivener, such a will must either be void or convey a different estate from the one intended. That such a will is not void, is proved by repeated declarations of judges that by the legal construction they knew that the intent of the testator was frequently violated. Doug., 763; 1 Brod. & Bing., 261, n.; Cowp., 660."

In *Mann* v. *Mann*, 1 Johns. Ch. Rep., 234, Chancellor Kent said: "From Cheney's case (5 Coke, 68,) down to this day, it has been a well settled rule that parol evidence cannot be admitted to supply, or contradict, enlarge or vary the words of a will, nor to explain the intention of the testator, except in two specified cases.  1st. Where there is a latent ambiguity

arising *dehors* the will as to the person or subject meant to be described, and 2d to rebut a resulting trust."

In *Tucker* v. *Seaman's Aid Society*, 7 Met., 188, the legacy was to the "Seaman's Aid Society in the city of Boston." Another society denominated the "Seaman's Friend Society" claimed the legacy, and offered evidence to prove that the testator had no knowledge of the existence of the society named in the will; that he knew of the existence of the other society, was deeply interested in its objects, and contributed to its funds, and had frequently expressed a determination to give it a legacy; that he directed the scrivener who wrote his will to insert the legacy as made to said society; that the scrivener not knowing of the existence of said society, told the testator that the name of this society was the "Seaman's Aid Society;" and that the testator thereupon submitted to have that name inserted. Held, that the evidence was inadmissible and that the "Seaman's Aid Society" was entitled to the legacy.

In *Hiscocks* v. *Hiscocks*, 5 Mees. & Wels., 363, the devise was to the testator's son John H. for life, and on his decease to the testator's grandson John H., eldest son of the said John H., for life; and on his decease to the first son of the body of his said grandson John H. in tail male, with other remainders over. At the time of making the will the testator's son John H. had been twice married; he had by his first wife one son, Simon; by his second wife an eldest son, John, and other younger children, sons and daughters. It was held that evidence of the instructions given by the testator for his will and of his declarations after its execution was not admissible to show which of these two grandsons was intended by the description in the will.

In *Drake* v. *Drake*, 8 House of Lords Cases, 172, the devise was to "my sister Mary Frances Tyrwhitt Drake," and : further residuary devise to "my niece Mary Frances Tyrwhitt Drake;" at the time of his will and death the testator had neither sister nor niece bearing that name; but he had a sister-in-law who did, and she claimed the devises, and in support of that claim offered the evidence of the solicitor who

prepared the will as to the instructions which he received from the testator; and it was determined that the evidence was inadmissible.

In *Charter* v. *Charter*, Law Reports, English and Irish Appeals, House of Lords, Vol. 7, 364, (1874,) it was determined that evidence of the declaration of a testator as to whom he intended to benefit or supposed he had benefited, can only be received where the description of the legatee or of the thing bequeathed is equally applicable in all its parts to two persons or to two things.

Sir James Wigram's seventh proposition is as follows: "Notwithstanding the rule of law which makes a will void for uncertainty where the words aided by evidence of the material facts of the case are insufficient to determine the testator's meaning, courts of law, in certain special cases, admit extrinsic evidence of *intention* to make certain the *person* or *thing* intended, where the description in the will is insufficient for the purpose. These cases may be thus defined. Where the object of the testator's bounty, or the subject of disposition, (that is, the *person* or *thing* intended,) is described in terms which are applicable indifferently to more than one *person* or *thing*, evidence is admissible to prove which of the persons or things so described was intended by the testator." Wigram on Extrinsic Evidence, sec. 184, page 160. Mr. Justice Williams says: "In a court of construction, when the factum of the instrument has been previously established in the court of probate, the inquiry is closely restricted to the contents of the instrument, in order to ascertain the intentions of the testators." Williams on Executors, Vol. 1, page 313, 5th edition.

Our attention was directed to the following cases by counsel for the American Bible Society. After a careful study of them we cannot see that they break the force of the rule stated.

In the case of *The American Bible Society* v. *Wetmore*, 17 Conn., 181, there was a bequest to the Foreign Missionary Society; no corporation bearing that name claimed it; but it was claimed by the American Board of Commissioners for

Foreign Missions. There being no legatee answering to the description in the will, the court below admitted evidence tending to show that at the date of the will the last named society was commonly known to the testatrix and among the members of the church to which she belonged by the name of the Foreign Missionary Society.

In *Ayres* v. *Weed*, 16 Conn., 291, the devise was to the *Protestant Episcopal Church in New Canaan;* there was a voluntary association which had acquired by assumption or reputation the name of the *Protestant Episcopal Society* in New Canaan. The plaintiffs claimed that the *church* was a body composed of the communicants and all baptized persons in the *society;* that it was a distinct body from the latter; that it was not known to the law and therefore that a devise to the *church* was void. There was therefore no legatee answering the exact words in the will; there was only one claimant for the legacy; and the court allowed parol proof that the terms "church" and "parish" were with respect to this denomination used indiscriminately and in the same sense as the term "society;" that the devisor himself in speaking of the affairs of the society always called it "the church;" that he had long been a member of the society and contributed to its support very liberally. In the course of the opinion the court says: "In this case it appears that there were two bodies of persons, neither of which had any name excepting by assumption or reputation; by which is meant that neither of them had any name conferred upon or attached to it by any law or charter; and that both of them were usually and indiscriminately called and known by the name used in the will to denote the devisee." And after adverting to certain arguments of counsel the court says: "But however that may be, we have no doubt that the case presents a latent ambiguity, explainable by parol evidence of the testator's intention."

In *Brewster* v. *McCall's Devisees,* 15 Conn., 275, the bequest was to the "Missionary Society of Foreign Missions." The bequest was claimed by the American Board of Commissioners for Foreign Missions, no other society claiming it; the

heirs at law resisted the claim upon the ground that there was no such society in existence as that named in the will, and that therefore the bequest was inoperative. The court says: "It appearing from the testimony in the case that there are several societies pursuing the same object as that of the society named in this devise, and which were in existence when this will was executed, it becomes necessary to ascertain which of them was intended by the testator. That parol testimony is admissible for this purpose does not admit of a doubt. It is the case of a *latent ambiguity*, raised by the parol evidence, which discloses the fact that there are several such societies, and which therefore may be removed by the same species of evidence." The case was disposed of upon the ground that there was no society bearing the name inserted in the will; that there were several whose objects and character were correctly described by those words, considered as words of description; and that there is nothing in the will to show that the testator intended to designate any particular society by name.

In *Trustees* v. *Peaselee*, 15 N. Hamp., 317, the bequest was to the "Franklin Seminary of Literature and Science, Newmarket, N. H.," and there was no other school or seminary of learning or science in that town except the "South Newmarket Methodist Seminary." There being no other claimant the court admitted parol evidence of the testator's declarations made at the time of executing his will as to the intended recipient of the bequest.

These cases were determined upon the principle that where in the matter of description there is a mistake, that is, there is no corporation which corresponds to the description in all particulars, but there is one corresponding in many particulars, and no other which can be intended, such corporation will take. Where the name used does not designate with precision any corporation, but, where the circumstances come to be proved, so many of them concur to indicate that a particular one was intended, and no similar conclusive circumstances appear to distinguish and identify any other, the one thus shown to be intended will take.

In *Selwood* v. *Mildmay*, 3 Vesey, 306, the bequest was of a part of the testator's four per cent. annuities; at the date of the will he had no such property, having previously changed it into long annuities; the court received the evidence of the scrivener to prove that the testator as part of his instructions for the will placed in his hands a former will giving legacies from the four per cent. stock and that he being ignorant of the change of investment had made the mistake; and upon this evidence the mistake was corrected. Of this case Tindal, C. J., said in *Miller* v. *Travers*, 8 Bingham, 244, as follows: "This case is certainly a very strong one, but the decision appears to us to range itself under the head that *falsa demonstratio non nocet*, where enough appears upon the face of the will itself to show the intention, after the false description is rejected." And in Wigram, 167, it is said that the case as explained in *Miller* v. *Travers* may be regarded as a case decided upon a correct principle wrongly applied to the facts and which ought not to be followed *in specie*.

In *Thomas* v. *Thomas*, 6 T. R., 671, the devise was to "Mary Thomas of Llechlloyd, in Merthyr parish," and it was found that Mary Thomas who was described in the will as the testator's granddaughter was his great-granddaughter, and lived at Greencastle in the parish of Llangain, some miles from Merthyr parish, where she had never been in her life. The testator had a granddaughter by the name of Elinor Evans, who, at the date of the will lived at Llechlloyd, in Merthyr parish. The legacy was declared void on account of uncertainty as to the legatee; the court saying however that declarations of the testator made cotemporaneously with the execution of the will as to which of the two persons was in his mind, were admissible. But in *Hiscocks* v. *Hiscocks* Lord Abinger said that *Thomas* v. *Thomas* seemed to him to be at variance with the decision in *Miller* v. *Travers*, which last he thought entitled to great weight.

We advise the Superior Court that the American and Foreign Bible Society is entitled to the legacy in question.

*Second.* The question with regard to the claim of the Hartford Hospital arises on the following facts: The testator by the ninth clause of his will gives eleven annuities, amounting in all to $3,700, the will then proceeding as follows:

"For the purpose of paying these annuities, I devise to John C. Parsons, of Hartford, bonds of the state of Connecticut, to the amount of fifty thousand five hundred dollars, to be held by him in trust to receive the interest and income therefrom, and pay said annuities therefrom, and if such interest and income is not sufficient, the balance to be paid by my executors out of funds in their hands. If any of said bonds should be paid, the amount to be re-invested in good state or national bonds, and the said amount so placed in the hands of said Parsons as trustee, with any part of the income therefrom not required for said annuities, shall be disposed of as in the next clause provided, after and as fast as the said annuities cease.

"10. It is my will that the said amount so placed in the hands of said Parsons as trustee, after and as fast as said annuities shall cease, shall be equally divided between the Hartford Hospital Society and the Connecticut State Prison, the principal to be kept invested in good bonds or mortgages, and the interest and income therefrom to be used to pay over to persons discharged therefrom who are destitute, and are thought worthy of aid; such aid not to exceed thirty dollars to any one person in any one year, and to be given at the discretion of the steward, or person in charge, and the visiting physician of said hospital, as to those discharged therefrom; and at the discretion of the warden or person having the charge of the prison, and the chaplain, as to those discharged from the state prison. The said half of said fund so to be used for the state prison is to be paid over to the state of Connecticut in trust for the purposes named, and the principal to be kept invested as aforesaid, and the interest and income alone used as aforesaid.   *   *   *   *   *

"12. I give and devise to the Hartford Orphan Asylum the westerly half, and to the Hartford Hospital Society the easterly half, of the land owned by me on the northerly side

of Hamilton Street, and extending back to an alley about one hundred and twenty feet, in ten acre lot No. 140 in the city of Cleveland."

The testator afterwards, on the 5th day of October, 1874, made a codicil of which the second clause was as follows:

"*Item:* I do hereby revoke all devises in said will beneficial to the Hartford Orphan Asylum, and to the Hartford Hospital Society, and in substitution for said devises I do hereby give and bequeath to the said Hartford Orphan Asylum the sum of five thousand dollars, payable one-half in one year and one-half in two years after my death without interest; and I do hereby give and bequeath to the said Hartford Hospital the sum of five thousand dollars, payable one-half in one year and one-half in two years from my death without interest."

The Hartford Hospital in its answer avers as follows:

"Said testator owned real estate in the state of Ohio. His will was drawn by Loren Prentiss, Esq., of Cleveland, his confidential adviser, and a practicing attorney in Ohio. Contemporaneously with said draft of the will said Prentiss advised the testator that there had been statute laws of the state of Ohio avoiding devises of land in Ohio to corporations, if such devises were made within one year before the death of the testator, and that he was uncertain whether said statutes were in force; that he would advise the testator as to the statutes upon his return to Ohio, so that the gifts of land in Ohio to the corporations could be made available by substitutions of deeds or pecuniary legacies; and said Prentiss did, in August or September, 1874, advise the testator that such devises would be avoided by the testator's death within one year; and solely in consequence of said advice, the testator made his codicil to his will, substituting a pecuniary legacy by his first item to the donees of article twelve, and only as a substitute for article twelve, and at the same time made a deed of the property described in articles thirteen and fourteen to the devisees named in said articles, and in substitution for said articles thirteen and fourteen in said original will. Said codicil and said deeds were drawn under Mr. Prentiss's instructions that his gifts of land to said corporations were

liable to be avoided, and for the purpose of securing in other forms an equivalent and substituted benefit to his said devisees. And the gifts to the corporations in item first of the codicil were of substantially the same worth as the devise of the land. And any other apparent change in his gifts to the hospital than such substitution, if any there is, is a mistake, and against the intention of the testator. For these causes, and others, the respondent asks the court to decree that the revocation aforesaid in the codicil be limited to the twelfth clause of said will."

The court makes the following finding of facts upon this point:

Upon the trial the Hartford Hospital Society, in support of the allegations of their answer, offered in evidence the deposition of Loren Prentiss, Esq., a lawyer of Cleveland, Ohio, and the testimony of Mr. A. C. Dunham, that the letter of Prentiss to the testator, referred to in the deposition, had been received by him when the codicil to the will in question was made; and that the deeds referred to in the last item of the codicil were made because of the letter; also that the real estate devised by the twelfth article of the will was of the value of about $10,000. Also the testimony of H. C. Robinson, Esq., that he drew the codicil for the testator, who then told him that by his will he had given land in Cleveland to the Hartford Hospital Society and to the Hartford Orphan Asylum; that he then inquired of the testator if that was all that he had given them, to which he replied, "Yes." The counsel for the executors objected to all this evidence, as being in its character inadmissible for the purpose for which it was offered. If the same be admissible, it is found that while the testator intended, by the first item of the codicil, to revoke any and all provision which he had made by his will for the Hartford Hospital Society, and to substitute therefor the legacy of $5,000, given by the codicil, yet that he had not, when the codicil was made, in his recollection the bequest which he had made to them by the tenth article of his will, and his attention was directed only to the devise to them contained in the twelfth article of the will.

Dunham *v.* Averill.

The deposition referred to is as follows:

" Loren Prentiss, of lawful age, residing at Cleveland, Ohio, being duly sworn, on his oath does depose and say, as follows: On the 14th day of July, 1874, I drew the will of James Root, of that date. At the time of drawing the will I informed Mr. Root that there was a statute which I believed to be still in force, in Ohio, by which it was enacted that any testamentary gift or devise, made within one year of the death of the testator, to any corporation or society, should be void, and that if he wished the bequests and devises made by him to corporations, of property in Ohio, to be certain of taking effect, it would be necessary for him to make formal convey-ance of the property, and that otherwise his death within one year from that date would make void such bequests or devises of property in Ohio. The will referred to was drawn at the residence of Mr. Root in Hartford, and I was at the time somewhat pressed for time, not having expected, when I vis-ited him, to be called upon to draw his will, and I said to Mr. Root that upon my return to Cleveland I would ascertain if the law referred to was still in force, and write him. As soon as my engagements would permit, after my return to Cleveland, I looked up the law in question, and finding it to be still in force, I wrote to Mr. Root to that effect. Of this letter I preserved no copy, but its purport was to the same effect as I have stated, and it was written not later than the month of August, 1874."

A codicil is defined to be some addition to or qualification of one's last will and testament. For certain purposes it brings the will to its own date; it is to be regarded as a part thereof; both are to be construed as one instrument, and they are alike subject to the rules of law governing the admission of parol evidence for the purpose of adding to, varying or explaining their respective contents. The authority of both rests upon the execution of a writing in accordance with stat-utory requirements. To subject that writing to the mercy of men's memories and motives would be to repeal the statute judicially.

By the ninth and tenth clauses of the original will the tes-

tator had bequeathed to the Hartford Hospital a reversionary interest in a portion of a legacy of $50,500, and by the twelfth clause he had devised to the same corporation certain real estate in Ohio. In the second clause of the codicil are these words: "I do hereby revoke all devises in said will beneficial to the    *    *    *    *    Hartford Hospital Society." These are plain words, all of common use and well known meaning. The paragraph is as direct, certain, and comprehensive as can be framed from our language. Nothing in itself, nor in any other clause of the will or codicil, suggests a doubt as to its meaning. The authorities and precedents hereinbefore cited defend it from the explanations of the solicitor who wrote it.

In *Guardhouse* v. *Blackburn*, Law Reports, 1 Prob. & Divorce Cases, 109, the head note is as follows: "Where a codicil had been read over to a capable testatrix and duly attested by her, the court refused to exclude from probate certain words inserted in it, and which were not in accordance with the instructions given by her to her solicitor, nor were contained in the draft codicil which had been read over to and approved by her, although such words were sworn by the solicitor who prepared the codicil to have been inserted without any instructions from her, and by his inadvertence." In delivering his judgment Sir J. P. Wilde said: "The codicil was proved to have been read over to the testatrix before the execution thereof, she duly executed the same, and the court conceives it to be beyond its functions or powers to substitute the oath of the attorney who prepared it, fortified by his notes of the instructions of the testatrix, for the written provisions contained in a paper so executed."

There is an offer to prove by parol testimony that the use of the expression "all devises" in the codicil was the result of a mistaken recollection on the part of the testator as to the number of devises and legacies to the Hospital contained in the original will; and it is true that the law will presume in favor of a devise or legacy that it is not annulled by a clause of revocation in a codicil if a mistake as to a fact moves the testator to write it and continue it in force, and he

states in the writing what the fact is and therein shows that the revocation is made conditional upon its existence.

In *Campbell* v. *French*, 3 Ves., 321, the testator having by will bequeathed to the two grandchildren of his late sister £500 each, by a codicil declared that he revoked the legacies bequeathed by his will to such grandchildren, *assigning in his codicil as the reason for the revocation that they were all dead;* in fact they were all living after his death, and Lord Loughborough held that the legacies were not revoked.

In *Evans* v. *Evans*, 10 Adol. & Ellis, 228, the testatrix devised lands for life to *A*, with remainder to his first and other sons in tail, with remainder to his daughters in tail. By a codicil, *after reciting the above devise and that A had died without leaving issue,* she devised the lands to *B*. In fact *A* did leave a child whose birth was unknown to the testatrix when she made the codicil. This was held to be a conditional revocation; and the fact being contrary to what she had supposed, the devise in the will remained in force.

Upon these two cases Mr. Jarman remarks as follows: "Had the testator in the two preceding cases, instead of making the death of the devisee or legatee, under the circumstances described, the ground or reason of the revocation, founded such revocation on his advice or belief only of the fact, it is conceived that the result would have been different. A distinction of this nature seems to be warranted by the case of *Attorney-General* v. *Lloyd*, 3 Atk., 552, 1 Ves. Sen., 32, where a testator, having by a will made before the passing of the statute of 9 Geo. II, ch. 36, devised lands and bequeathed personalty to be laid out in lands for charitable uses, made a codicil posterior to the act, by which, after reciting that *being advised* that the devise of his lands would be void, and it being his intention that the charity should be continued, and being advised that his personal estate could be given, he did by such codicil give his personal estate to the charitable uses before mentioned, and he did thereby give his real estate to *B*. Though the testator's notion as to the invalidity of the devise in the will was erroneous, it was held that the devise to *B* took effect. So, where a testatrix by her

will bequeathed £300 among such of the children of *E* as should be living, and by a codicil proceeded as follows: ' I give to my brother's son *C* the £300 designed for *E's* children, as I know not whether any of them are alive and if they are well provided for,' Sir R. P. Arden, M. R., held *C* to be entitled though the children of *E* were living.  He observed that it was argued, and with some ground, that if it rested upon her not knowing whether they were living, there would be some reason to contend that it fell within the case (so often cited from Cicero de Oratore) of *pater credens filium suum esse mortuum, alterum instituit hæredem; filio domi redeunte hujus institutionis vis est nulla;* but the testatrix goes further, that she doubted, if they were living, whether they might not be well provided for, and she totally deprives them of that provision.  The court will not inquire whether they are well provided for or not.  *Attorney-General* v. *Ward*, 3 Ves., 327." 1 Jarman on Wills, (Perkins's Notes,) side page 166.

In *Gifford* v. *Dyer*, 2 R. Island, 99, it is said that if the testatrix "had made the will under a mistake as to the supposed death of her son, this could not be shown *dehors* the will.  The mistake must appear on the face of the will, and it must also appear what would have been the will of the testatrix but for the mistake.  Thus, where the testator revokes a legacy upon the mistaken supposition that the legatee is dead, and this appears on the face of the instrument of revocation, such revocation was held void."

Mr. Jarman states the rule thus: "And here it may be observed that where a testator, by a codicil revokes a devise or bequest in his will or in a previous codicil, expressly grounding such revocation on the assumption of a fact which turns out to be false, the revocation does not take effect; being, it is considered, conditional and dependent on a contingency which fails."  1 Jarman on Wills, (Perkins's Notes,) side page 165.

In this writing the testator has not stated the reason for his act of revocation; he has not based it upon the assumption of any fact which has turned out to be false; his completed

written work gives no clue as to what moved him to make the change; he has used only the words absolutely necessary to effect a result. But the court is asked to find from extrinsic parol evidence that one, selected from the many impressions which might have produced action, was the source and only source from which the impulse came; and that upon this impression the revoking clause held its place in the codicil to the testator's death. We think this cannot be done.

Again, the parol evidence, if received, would seem to be scarcely sufficient to justify the court in striking out the words "all devises" and inserting the words "one of the devises." It is found that when the testator sat down to write the codicil he intended to recall all devises and legacies previously made to the hospital. If therefore that instrument contained several different devises and legacies to that corporation, his all-including intention to revoke would reach each one, even if at the instant the memory failed to marshal them all before him. If there was that dominant thought that everything should be withdrawn, then the thought and the expression of it are in harmony.

It is suggested by counsel that the word "beneficial" excludes the legacy in trust to the hospital from the operation of the revoking clause, inasmuch as it is solely for the benefit of out-going patients, and that there is in the corporation simply a naked trust. But, it is quite certain that in the testator's mind any person would be benefited by being made an instrument for the distribution of his gifts. In his will he devises land to A. C. Dunham in trust, merely to hold the legal title until a charter should create a corporation capable of taking it; a trust which probably would be burdensome, certainly would be unprofitable; yet the testator speaks of this, the most barren title known to the law, as "beneficial." Throughout the will and codicil, such words as "devise," "legacy," "bequest," and "beneficial," are used as the people use them, and not with professional accuracy and meaning.

We advise the Superior Court that all devises and legacies to the Hartford Hospital, contained in the body of the will, are revoked by the codicil thereto.

*Third.* Concerning the legacy of three thousand dollars to the "American and Foreign Missionary" Society the petition contains the following averments:

"It appears that the testator was, during his life-time, an attendant at churches of the Congregational order, and was a contributor to the various benevolent societies sustained wholly or in part by the churches of that denomination, and was not in especial sympathy with churches or societies maintained by any other religious denominations; that there is not, as the petitioners are informed and believe, any society or incorporation named or known as the American and Foreign Missionary Society; that there is a society incorporated by the legislature of the state of Massachusetts, in the year 1812, by the name of 'The American Board of Commissioners for Foreign Missions,' which is sustained mainly by churches and individuals of the Congregational order, and to which the testator in his life-time had been accustomed to contribute; that said American Board of Commissioners for Foreign Missions claim that said legacy of three thousand dollars to the American and Foreign Missionary Society was intended for themselves, and demand that it shall be paid to them, and the question arising upon these facts is, whether the said American Board of Commissioners for Foreign Missions is legally entitled to receive said legacy, and if not, then who is entitled to receive it, or whether it shall become a part of the residuum of the estate."

To these averments the American Board of Commissioners for Foreign Missions make answer as follows:

"The said defendant admits that the said James Root was during his life-time an attendant at churches of the Congregational order, and a contributor to the various benevolent societies sustained in whole or in part by the churches of that denomination, and was not in especial sympathy with churches or societies maintained by any other religious denomination; that there is no society or corporation known by the name of the American and Foreign Missionary Society; that the defendants were incorporated by the legislature of Massachusetts in the year 1812, by the name of the American Board

of Commissioners for Foreign Missions; and they claim that said bequest of three thousand dollars in said will to the American and Foreign Missionary Society was intended by the testator to be a devise to these defendants, and for this claim they here assign the following reasons, to wit:

"1st. The American Board of Commissioners for Foreign Missions was established and incorporated 'for the purpose of propagating the gospel in heathen lands,' and has expended and is expending large sums of money annually in sustaining missions in foreign countries, and is sustained by persons belonging to the sect of Christians called Congregationalists.

"2d. The said James Root in his life-time was for many years a resident of the town of East Hartford, in said Hartford County, and a member of the Congregational society in that town; that contributions to the funds of the defendant were annually called for from the members of said Congregational society, and Mr. Root was a cheerful and liberal patron of those contributions.

"3d. There is no other society or corporation connected with the Congregational order in Connecticut that has for its object the support of missionaries in foreign lands.

"4th. The defendant corporation in the vicinity in which Mr. Root lived and died was known as the Foreign Missionary Society, to distinguish it from the Home or Domestic Missionary Society.

"5th. The term 'American and Foreign Missionary Society,' used by the testator, designates the purposes and objects of the defendant corporation, inasmuch as it is an American corporation for the purpose of supporting missionaries in foreign lands."

The court found the allegations of the answer to be true.

There is a clearly expressed intention on the part of the testator to make a contribution from his estate to the cause of missions in foreign lands. The court finds that no corporation or society is known by the name of the "American and Foreign Missionary Society;" that the "American Board of Commissioners for Foreign Missions" is a society incorporated

for and engaged in the work of foreign missions; that it is supported by persons belonging to the Congregational order; that it received annual contributions from the Congregational society of which the testator was a member; that he was a cheerful and liberal contributor to its funds; that there is no other society or corporation connected with the Congregational order in Connecticut sending missionaries abroad; and that it was known in the vicinity where he lived and died, by the name used in the will.

Inasmuch as no other society claims the legacy, the case upon this finding falls within the principle to which we have already referred and which we here re-state, namely, that where the name used does not designate with precision any corporation, but, when the circumstances come to be proved, so many of them concur to indicate that a particular one was intended, and no similar conclusive circumstances appear to distinguish and identify any other, the one thus shown to be intended will take. *Brewster* v. *McCall's Devisees*, 15 Conn., 274.

We advise the Superior Court that the "American Board of Commissioners for Foreign Missions" is entitled to the legacy given to the "American and Foreign Missionary Society" in the eleventh section of the will.


*Fourth.*  Concerning the legacy to James P. Averill the petition contains the following averments:

The seventh section of the will is as follows: " I give and devise to my brother Samuel's three sons, Buel, Judson, and Charles M.; the four sons of Henry P. Averill of Perrysburgh, Ohio, James, Henry, Elisha, and the other son whose name I do not certainly remember, but think it is Elijah; and the two sons of Mary Allen (granddaughter of my sister Mary) and their heirs—to each of said nine nephews, three thousand dollars; and to said Charles M. I give an additional one thousand dollars."  And the petitioners found, after the death of the testator, among sundry promissory notes payable to him, a receipt in the handwriting of the testator, and

signed by James P. Averill, son of Henry P. Averill, above named, which was as follows: "Oct. 1, 1872. Received of James Root, Hartford, Connecticut, Three Thousand Dollars, in anticipation and discharge of any legacy bequeathed to me by said Root by his will of prior date. JAMES P. AVER-ILL;" which receipt bears the following endorsement or filing in the hand-writing of the testator, namely, "Rect. & note, James P. Averill, Perrysburgh, Ohio, Oct. 1, 1872." And it is admitted that the sum of three thousand dollars was at the date of the receipt paid by the testator to said James P. Averill; and the question arising upon these facts is, whether such payment constitutes an advancement or charge against the said James P. Averill which will bar or offset said legacy.

No such relation is shown to have existed between the legatee and the testator as will admit of the application of the law concerning advancements; these being the giving by anticipation the whole or part of what it is supposed children will be entitled to on the death of their parents. The receipt, if admitted, in terms refers to what had been done in the past and not at all to what may be done in the future; it furnishes indisputable evidence that both parties to it regarded the sum named therein as a gift, not a loan to be repaid. But, beyond this, the language of the will is clear and precise, both in respect to the legatee and the legacy; no expression in it, no fact existing outside of it, throws the shadow of a doubt upon the identity of either; we can discover no door for the admission of the extrinsic evidence; the testator, having in memory all that had previously passed, chose at last to insert the name of James P. Averill in his re-drafted will. Therefore, as it is not found that there is any indebtedness on the part of the legatee to the testator, we advise the Superior Court that it is the duty of the executors to pay this legacy.

In this opinion the other judges concurred.