WILLIAM BULKELEY, EXECUTOR, vs. THE WORTHINGTON
ECCLESIASTICAL SOCIETY ET ALS.

First Judicial District, Hartford, January Term, 1906.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

The practical impossibility of tracing back present corporate assets to
their source for the purpose of attempting to establish .alleged
equities therein between a life tenant and a remainderman, has
compelled the adoption, for general application, of the rule that
assets distributed by a corporation in liquidation are to be regarded
as capital and not income, and therefore go to swell the corpus
of the trust fund and increase the interest of the remainderman.
This rule is on the whole the most reliable, just, and effectual in
·its operation of any which can be devised.

In the present case a corporation voted to discontinue business and
wind up its affairs, and to sell its plant and other assets, except
cash on hand, bills and accounts receivable, and cash due on com-
pleted contracts, to another company, in return for certain shares
of the latter's stock and a stated sum of money. All the stock-
holders of the liquidating company agreed to and did accept, in
the distribution of its effects, their proportionate share of the stock
of the purchasing company. Pursuant to the foregoing action, all
the reserved assets were sold and the proceeds thereof, together
with the sum received from the vendee company, were paid by
vote of the directors of the liquidating company to its stockholders
in the form of cash dividends. Held that as between the executor
of the life tenant and a remainderman, the assets so distributed
belonged to the corpus of the trust fund and accordingly went to
the remainderman.

A testatrix having made bequests to an ecclesiastical society, and to
several missionary societies and schools, directed the residue of
her estate to be equally divided "among the schools and mission-
ary societies" mentioned in her will. Held that the ecclesiastical
society was not included in this designation, and therefore was
not entitled to share in the bequest of the·residue.

If the expressions of a will are free from ambiguity, they unalterably
disclose the intent of the testator, and no extrinsic evidence of it
is in such case permitted.

Argued January 2d—decided March 7th, 1906.

ACTION of interpleader to determine the rights of ad-
verse claimants in and to certain property and funds held

by the plaintiff as executor of the will of Harriet N. Wilcox of Berlin, deceased, brought to and tried by the Superior Court in Hartford County, *Reed, J.;* facts found and judgment rendered in favor of the schools and missionary societies named in the will, and appeal by certain claimants.

*Charles Welles Gross*, for the plaintiff.

*Frank L. Hungerford*, for one of the appellants (the estate of Sherwood F. Raymond).

*William Waldo Hyde*, for one of the appellants (the Worthington Ecclesiastical Society).

*John H. Kirkham* and *James E. Cooper*, with whom was *George W. Andrew*, for the appellees (the American Board of Commissioners for Foreign Missions *et als.*).

PRENTICE, J.   There are two questions presented upon the record.   The first grows out of the conflicting claims of life tenants and remaindermen to the fruits of stocks held in trust.   It arises upon the demurrer of the remaindermen to the answer and claim of the life tenants.   The pertinent facts involved, as they are admitted by the demurrer, are the following :  By the will of Harriet N. Wilcox, who died in April, 1893, Sherwood F. Raymond was given the residuum of her estate " during his life, and after his decease . . . . to be equally divided " among certain remaindermen.   Among the property received by Raymond as a part of the corpus of this trust fund were 259 shares of the stock of the Berlin Iron Bridge Company, of the appraised value of $7,122.50. Subsequently for a period of years the Company did a large business, paid regular dividends, and accumulated a large surplus out of its earnings, and its stock came to have a largely increased market value.   In this situation the Company, by the unanimous vote of its stockholders, voted to discontinue its business and wind up its affairs, and to sell its entire plant and all its materials, merchandise, assets,

business, contracts and good-will, except its cash on hand, bills and accounts receivable, and cash due on completed contracts, to the American Bridge Company, in consideration of the receipt by the selling company of certain preferred and common shares of the vendee corporation and certain cash. This vote was carried out and the Berlin Iron Bridge Company received said stock and cash. The assets retained by the Berlin Company in this transaction were all, in the process of liquidation under the vote, turned into cash, and all debts and claims paid, leaving in the treasury a considerable sum in cash. All the stockholders of the Berlin Company agreed to accept in the distribution of its effects their proportional shares of said American Bridge Company stock, and such distribution was made. The cash in the treasury as the result of the payment by the Bridge Company and the liquidation as aforesaid, was by the directors voted to the shareholders in cash in the form of dividends. Said Raymond received his proportional share of both said stock and cash. The amount received in cash was $6,151.25, and the admission of the demurrer is that it was paid out of assets representing surplus earnings. The American Bridge stock thus received by Raymond was later, and during his lifetime, exchanged for stock of the United States Steel Company as the result of the absorption of the former company by the latter. Raymond subsequently died. The defendant executors of his will make no claim to said stock, but do claim said cash payments as rightfully belonging to his estate. The other defendants claim them as remaindermen.

The claim in behalf of the Raymond estate is based upon the admissions of fact that the cash received represented surplus earnings, and the general rule of law laid down in *Smith* v. *Dana*, 77 Conn. 543, to the effect that cash dividends declared and paid upon stocks held in trust are to be regarded as income and pass to the life tenants. In that case we took occasion to observe that, in applying this rule, regard should be had not alone to the letter of the vote of declaration but also to the substance and intent of the cor-

porate act as disclosed thereby. Judged by this test the votes of the directors, pursuant to which the cash in question was paid to Raymond, were in no true sense declarations of cash dividends within the meaning and intent of the rule. They were not passed by the directors in the exercise of their discretionary powers in determining what of the corporate assets representing surplus should be separated and withdrawn from that body of them to be retained for future corporate use, and, thus separated, go out to shareowners as income freed from all claim of the corporation thereon. There was no purpose on the part of the directors to make a division of profits, as such, among the owners of shares which were to continue to exist. The company was engaged in liquidating its business and distributing all its assets to its stockholders. The end sought was the return to the owners of stock of all that the company owned, and its distribution to them in exchange or substitution for the shares which thereafter were to cease to exist. The directors were called upon to exercise no discretion. They had but a single duty, and that was to distribute everything in their hands, and they performed that duty as to cash and stocks in like manner. The company had ceased its operations as a going concern. The period within which dividends in the ordinary sense are made had passed. Its acts were only the necessary perfunctory ones attending dissolution. To quote the language of the Supreme Court of Massachusetts upon the subject of this very rule, as reported in the recent case of *Brownell* v. *Anthony*, 189 Mass. 442, 445 : " This language was used of corporations continuing in existence, and retaining their capital for the purpose of exercising their corporate powers. Obviously it has no application to dividends of the assets, made in liquidation of a corporation which has been or is to be dissolved."

The remaindermen in their behalf assert the proposition that all assets distributed in the process of the liquidation of a corporation attach to the capital interest, and they appeal to the cases of *Second Universalist Church* v. *Colegrove*, 74 Conn. 79, and *Smith* v. *Dana*, 77 id. 543, in support of

their contention.    The life tenants contend that the con-
struction which the remaindermen give to the language of
the opinions in these cases is too liberal and sweeping, that
they were pronounced with respect to different states of fact
from that now presented, and that there appears in them no
intention to lay down a rule of universal application of such
scope as is now claimed for it.    We are led, therefore, to a
discussion of the general question involved.

Apparently the courts must assume one of two attitudes,
to wit : (1) adopt and apply the rule appealed to by the re-
maindermen as one of general application, or (2) adopt some
theoretical rule determinative of the conflicting rights and
claims of those who assert income and capital interests in
respect to assets held by corporations in liquidation, and in
each case enter upon a sorting-out process by means of which
and through a minute examination into the affairs of the
corporation, the source, quality and character of the corporate
assets shall be discovered and determined, and those assets
which, within the adopted rule, attach to the income interest
be aparted from those which properly belong to the capital
interest.    The latter attitude, it will be seen, involves as the
first step the adoption of a just and equitable rule to be ap-
plied, and this will be found to be no easy task, as courts
and legal writers have discovered.    The life tenants com-
mend the rule referred to upon the closing page of *Smith* v.
*Dana* as that which alone leads to exact justice.    It has in-
deed a plausible sound, but it would be easy to point out its
shortcomings.    But we have no occasion to pursue this sub-
ject.    Let it be assumed that a rule of assortment is estab-
lished.    It requires little imagination to picture some of the
practical results which would attend the judicial attempt to
"hunt back," to borrow Lord Loughborough's suggestive
phrase, through the mazes of corporate history to discover
the source of present assets.    Under such a system no one
could know his own rights or those of others.    Litigation
would offer the only open door to knowledge.    That litiga-
tion would be such as would involve the bringing into the
field of most critical and intimate investigation all the affairs

of the corporation, covering possibly a long period of years in the attempt to trace assets to their origin. How expensive, harassing to parties and the corporation, impracticable, speculative and impossible of intelligent result such proceedings would be, is apparent. The consequences of such conditions, to both the interested parties and the disinterested corporation, would be scarcely endurable, and such as would amount to a practical denial of justice to those who could not afford to litigate. The necessity of some plain, simple and workable rule for the prevention of controversies and the guidance of all concerned, is as pronounced in the situation under review as we have indicated it to be in the case of dividends by going concerns, and for the same reasons. *Smith* v. *Dana*, 77 Conn. 543; *Boardman* v. *Boardman*, 78 id. 451.

The necessities of the situation, therefore, compel the adoption, for general application, of the rule that assets distributed by corporations in liquidation are to be regarded as capital and not income, as the one which is on the whole the most safe, just and practical in its operation of any which can be devised. The Supreme Court of Massachusetts has recently given its adhesion to this rule. *Brownell* v. *Anthony*, 189 Mass. 442.

The operation of this rule is criticised as inequitable in the present case, and such criticism of it is often made. These criticisms will generally be found to be colored by the mistaken conception that undeclared earnings, as such, and while unaparted from the corporate assets, are from the point of view of the shareowners' interests to be regarded as income. Curiously enough we have recently had urged upon us the claim on behalf of remaindermen, that earnings not declared but retained in the corporate treasury belonged of right and in equity to capital and not to income. *Boardman* v. *Boardman*, 78 Conn. 451. These contradictory claims well illustrate the influence of one's point of view, and alike ignore the importance which our law attaches to the corporate action as determining what shall, as to stockholders, be regarded as capital and what income. Any ar-

gument which disregards that factor is certain to be misleading. And so is any which assumes that what is surplus earnings or profits in its relation to the corporation, is income in its relation to the stockholders. That is not true anywhere. It is universally true that surplus earnings do not, as to stockholders, partake of the character of income until they are declared as dividends, and whether they will ever be so declared is a matter of uncertainty, since, speaking generally, they may in the discretion of the directors, although not capitalized, be forever retained in the corporation to serve as a part of its working capital. In this State and elsewhere it is only to surplus earnings declared in cash that the character of income attaches, and through the medium of stock dividends they may go to capital and permanently inure to the benefit of that interest. *Smith* v. *Dana*, 77 Conn. 543; *Gibbons* v. *Mahon*, 136 U. S. 549. In other words, the question whether corporate earnings are, from the standpoint of the shareowners, to be regarded as income, depends not only upon their being surplus earnings, but also upon the action of the corporation in setting them apart for the shareowners, and the nature of that action. The rule, therefore, which says that whatever of assets are to be regarded as income must be so declared by corporate action before liquidation proceedings, and, for the purposes of distribution in liquidation, treats as belonging to the capital interest all such assets as by the action of the directors during the continuance of the corporation as a going concern have not been aparted from the general body of assets and set out to stockholders, is neither unreasonable nor essentially unjust. It is a rule which accepts the situation as it was created by those empowered to so create it, and does not attempt to revolutionize it along new lines and by new agencies.

The second question presented arises out of the claim of the Worthington Ecclesiastical Society to share in the division of the residue of which Mr. Raymond had the life use. Paragraph 22 of the will, which gives to Mr. Raymond this life estate, directs that upon his decease the property shall

be "equally divided among the schools and missionary
societies mentioned in the above will." The paragraphs of
the will preceding the 14th contain legacies in favor of in-
dividuals. The 14th gives $2,000 to the Worthington Ec-
clesiastical Society, thus designated. The seven succeeding
paragraphs, being 15 to 21 inclusive, give various sums of
money to or for the benefit of the seven corporations, boards,
or societies designated in the will, as follows, to wit: the
American Board of Commissioners for Foreign Missions, the
Woman's Board of Missions, the American Home Missionary
Society, the American Home Missionary Association of New
York City, the Mount Holyoke Female Seminary, the Hamp-
ton School in Virginia, and the Northfield Seminary in
Northfield, Massachusetts. It is conceded that the seven
corporations last named are entitled to share in the distri-
bution of the residue, as being either missionary societies or
schools. The claim of the Ecclesiastical Society to enjoy
the same privilege is based upon the nature of its purpose
and work, which, it is said, is such as to fairly entitle it to
be embraced within the descriptive term "missionary so-
ciety." The statement of claim which was filed and de-
murred to, sets out the society's incorporation in 1772 by
an Act of the General Assembly, that it is "engaged in an
organized effort for the spread of religion by the maintenance
and support of a church known as the Congregational Church,
at Berlin, Connecticut," that the testatrix and her ancestors
have from the beginning been members and staunch sup-
porters of said society and its church, which have always
been the chief objects of their bounty, and that by her will,
drafted by her, she intended to include the society among
those who were to share the residue of her estate upon the
decease of the life tenant.

The testatrix has limited her bounty, as respects the di-
vision of her residuary estate, to "schools and missionary
societies." It is said that by the term "missionary society"
she intended to describe the claimant ecclesiastical society,
as well as the other societies and boards confessedly de-
scribed by her. This intent, if it appears from the will

when read in the light of the surrounding circumstances, must be controlling in the interpretation of the instrument; if it does not so appear, it is immaterial. *Weed* v. *Scofield*, 73 Conn. 670, 677 ; *Bryan* v. *Bigelow*, 77 id. 604, 614, 615. If the expressions of the will are free from ambiguity they unalterably disclose the intent of the testator, and no extrinsic disclosure of it is in such case permitted. *Jackson* v. *Alsop*, 67 Conn. 249, 252; *Post* v. *Jackson*, 70 id. 283; *Thompson* v. *Betts*, 74 id. 576.

The society's statement of claim assigns to the word " missionary " a specified signification. As courts take judicial notice of the meaning of English words, the assigned definition places no limitations upon our inquiry. *Nix* v. *Hedden*, 149 U. S. 304 ; 16 Cyc. 875.

The terms "missionary " and " missionary society " are of common use, and have a well accepted meaning. This meaning is the same whether the use is intended to be precise and technical, or merely that of every day speech. By universal acceptance the word " missionary," whether as a noun or adjective, embraces not only the conception of a religious, charitable or educational work or worker, but also of such a work done through philanthropic motives, for the welfare of others too poor, too unappreciative or too indifferent to do it themselves, and by persons supported or means furnished in part at least by some agency of which those for whom the work is done do not form a sustaining part. The derivation of the word implies a sending, and so it is that in both technical and common speech the idea of a sending forth, a sending forth to the service of others, the doing of a work for others, is associated with its meaning. Sometimes it is used to characterize the agency sent; sometimes of the agency sending ; but always there is associated with the notion of a benevolent service for others, that of such service sent, whether far or near, by those who maintain it to those who need it. We are aware of no use of the term as descriptive of self-supporting religious effort in the maintenance by, within and for an ecclesiastical society or parish, of churches, church services, Sunday-schools, and

the ordinary agencies of worship or religious activity according to the usual practice, and especially the practice of Congregational societies in the country towns of New England. Take the Worthington Ecclesiastical Society. Its history carries it back to colonial times and colonial conditions, when it was created a corporate subdivision of the Colony and stood as its representative in the performance of its then conceived public duty of ministering to the religious needs of the people within its limits. *Jewett* v. *Thames Bank*, 16 Conn. 511, 515. Its relation to the State has changed. Its purpose and work, however, in so far as appears, have not. It is averred that " it is engaged in an organized effort for the spread of religion by the maintenance and support of a church." So has it ever been and so we are bound to presume it to be, but it is not presumed, and it is not averred, that it is seeking its ends in any other than the old time and usual self-supporting way and by the maintenance of the usual agencies for religious ministration to and Christian work among its own people. Such a society may not be fairly termed or classed as a missionary one. It is inconceivable that any one familiar with the ordinary usages of the English language should have so termed or classified it. Especially inconceivable is it that this testatrix, with her New England heredity and ideas and her natural pride in the ancient church, which had been the religious home of her ancestors and her own and the especial object of her and their love and devotion, should have even by inadvertance described the society which supported it as a missionary one. However much she may have desired to make it a beneficiary under the 22d paragraph and intended to do so, we are clear that she has failed to express that intention; and as she has in clear and unambiguous language expressed a contrary intention, that language must be held to be controlling. *Dunham* v. *Averill*, 45 Conn. 61.

There is no error.

In this opinion the other judges concurred.