WILLIAM J. BOARDMAN ET ALS. *vs.* BURTON MANS-
FIELD ET AL., EXECUTORS.

*First Judicial District, Hartford, March Term, 1907.
BALDWIN, C. J., HAMERSLEY, HALL, PRENTICE and THAYER, Js.

Recent and repeated decisions of this court have affirmed the doctrine
—which, however, has long been the law of this State—that as
between the life tenant and the remainderman, cash dividends
upon corporate stock held in trust are to be treated as income,
to which the life tenant is entitled, while stock dividends are to be
regarded as capital enuring to the benefit of the remainderman.

A testator gave $200,000 worth of his property, to be selected by his
wife at its inventory appraisal, to his executors in trust, "the
dividends, rents and profits" of which were to belong to his wife
during her life, with remainder over to others. At the death of
the testator's widow, about thirty-five years later, this trust fund,
augmented by stock dividends and the proceeds of sales of "rights,"
had increased in market value to about $328,000. *Held:*—

1. That the expression "dividends, rents and profits," as applied to
the personal property selected by the widow, meant nothing more
than "net income."

2. That there being nothing ambiguous or uncertain in the meaning
or effect of this trust provision, it was not necessary to advert to
extraneous circumstances in order to throw light upon the testa-
tor's presumed intent.

3. That the rights of the respective parties, under the clause in ques-
tion, were controlled by the general rule above stated, under which
the enhanced market value of the trust property and all accre-
tions thereto belonged to the *corpus* of the fund and passed, as a
part of it, to the remaindermen upon the death of the life tenant.

Argued March 7th—decided April 10th, 1907.

AMICABLE SUIT to determine conflicting claims to funds
held by a trustee under the will of William W. Boardman,
late of New Haven, deceased, brought to the Superior
Court in New Haven County and reserved by that court,
*Thayer, J.,* upon the facts stated in the complaint, for the
advice of this court. *Judgment advised for the remainder-
men.*

*Transferred from Third Judicial District.

William W. Boardman, a resident of New Haven, made and executed his will, drafted by himself, on March 19th, 1870. He died August 27th, 1871, leaving that instrument as his last will, and a large estate comprised of both real and personal property. He also left a widow, Lucy H. Boardman, who survived until March 29th, 1906. Item third of said will reads as follows:—

"Item Third. I further give and devise to my executors hereinafter named, and the survivor of them, in trust, for the use and benefit of my dear wife, Lucy, during her natural life, two hundred thousand dollars, to be taken from such part or parts of the property as I may own at my decease, not hereinbefore devised to her, as she, the said Lucy, may desire and select, at the appraisal in the inventory, the dividends, rents and profits to go to and belong to my beloved wife, to her sole and separate use during her natural life, with reversion over after her death to the uses and appointments set forth in my last will and in the codicils thereto, if any. My intention and object was and is to make abundant provision for the support and comfort of my dear wife by the three preceding items, in lieu of dower or share in my real or personal estate."

Said widow, and a nephew, William J. Boardman, were named in the will as executors, and both qualified and acted as both executors and trustees as long as Mrs. Boardman lived. William J. Boardman is now the surviving executor and trustee.

December 29th, 1871, the widow, acting under said provision of the will, selected stocks and bonds from the estate of her husband to the appraised value of $200,000, and made return to the Court of Probate. The investments of the fund were thereafter changed from time to time, but always remained in dividend-paying or interest-bearing securities. The corporations, whose stocks were included in the fund, issued at various times new stock which the stockholders were privileged to take *pro rata* upon terms prescribed. The rights to take new stock which thus accrued to the fund were in some instances sold and the proceeds added

to it, and in other instances exercised and the new stock carried to it. Mrs. Boardman, during her life, received the net proceeds of all cash dividends and interest payable to the fund. At her death its market value had increased to $327,683.07. During Mrs. Boardman's life she unsuccessfully asserted to her cotrustee her right to benefits from the fund beyond those conceded to her, and these claims are made the basis of the present proceeding. The nature of them, and the other facts contained in the complaint which are involved in their determination, are sufficiently stated in the opinion.

*Henry Stoddard*, with whom was *Boardman Wright* of New York, for the remaindermen.

*Burton Mansfield* and *James E. Wheeler*, for the estate of the life tenant.

PRENTICE, J. The trust fund in question has always been comprised of personal estate, and of a kind which was either dividend-paying or interest-bearing. Mrs. Boardman, the life beneficiary, received from time to time during her life the entire net income of the fund accruing from cash dividends upon stocks, and the interest upon all other investments. The executors of her will, hereinafter referred to as " the executors," pursuant to its provisions, now assert the right to have from the assets of the trust an amount or amounts in addition to those which she thus received in her lifetime.

The market value of the fund upon the termination of the life estate was $127,683.07 in excess of its market value at the time of its creation. The major claim presented by the executors, which is comprehensive of all others, is for this amount. The contention thus made, it will be observed, is that the remainder interest is only entitled to have the fund kept intact to the extent of its original market value, and that the life tenant is entitled not only to have all else which may have flowed from or accrued to it, but

also to have both the existence and amount of its accretions determined upon the basis of market value, and that too, whether or not there have been changes in its investments.

It is manifest that this claim is in direct contradiction of the general principles governing the rights of life tenants and remaindermen in and to trust funds, which have been repeatedly affirmed and reaffirmed by this court, and that it cannot be supported unless there is something in the terms of the will creating the trust which takes it out of the operation of those accepted principles. *Brinley* v. *Grou,* 50 Conn. 66; *Spooner* v. *Phillips,* 62 id. 62, 24 Atl. 524; *Mills* v. *Britton,* 64 Conn. 4, 29 Atl. 231; *Smith* v. *Dana,* 77 Conn. 543, 60 Atl. 117; *Boardman* v. *Boardman,* 78 Conn. 451, 62 Atl. 339; *Bulkeley* v. *Worthington Eccl. Soc.,* 78 Conn. 526, 63 Atl. 351; *Green* v. *Bissell,* 79 Conn. 547, 65 Atl. 1056. This is conceded. Two matters, however, are relied upon as indicating the direction of the testator that the general rule should be departed from in the present case, and that Mrs. Boardman's estate should have what is now claimed in its behalf, to wit: (1) the language of the will giving to her the " dividends, rents and profits " during her life; and (2) the presumed intent of the testator arising from certain circumstances in the light of which it is claimed that the will should be construed.

The words " dividends, rents and profits," upon which reliance is thus sought to be placed, are no more comprehensive, as applied to personalty, than would have been " net income " used in their stead. *Guthrie* v. *Wheeler,* 51 Conn. 207, 213; *Beers* v. *Narramore,* 61 id. 13, 23, 22 Atl. 1061; *Spooner* v. *Phillips,* 62 Conn. 62, 66, 24 Atl. 524. " Whether the testator makes use of the expression ' dividends,' or ' dividends and profits,' or ' dividends, interest, and profits,' or (as in this case) ' interest, dividends, profits, and proceeds,' I look upon all of them to come to the same thing, and that this is too nice a circumstance to found any distinction on." *Hooper* v. *Rossiter,* McCl. (Eng. Ex.) 527, 536.

The argument advanced by the executors in support of

the presumed intent, which they seek to bring to their aid in the construction of the will, is substantially as follows: In 1870, when Mr. Boardman made his will, drafted by himself, a lawyer by profession although a business man by practice, the courts of this State had not declared the law of this jurisdiction. Decisions, however, had been made in other States, including Pennsylvania, New York and New Jersey. These decisions in these States had been in consonance with the views now urged by the executors. One of the Pennsylvania decisions, rendered shortly before the execution of the will, involved the interests of the parties thereto in stock of the New Haven Gas Light Company, of which the testator was president, and of the New York and New Haven Railroad Company, with whose transactions he had been familiar for many years. It must therefore be presumed that he was familiar with these decisions, or with the latter one at least, and it ought to be presumed that he used the language of his will with the purpose of accomplishing the result thus judicially outlined. So it is said that ambiguous phrases in it should be interpreted in accordance with those principles of law which the testator most probably had in mind when he used them. See *Earp's Appeal*, 28 Pa. St. 368; *Wiltbank's Appeal*, 64 id. 256; *Clarkson* v. *Clarkson*, 18 Barb. (N. Y.) 646; *Simpson* v. *Moore*, 30 id. 637; *Van Doren* v. *Olden*, 19 N. J. Eq. 176.

Before assent were given to this argument, it would be wise to inquire whether any of the decisions referred to had in fact gone to the extent necessary to support the present claim; and to examine the foundation of the alleged presumption that the testator knew and acted upon the faith of them, and did not know and act upon the faith of, for example, *Minot* v. *Paine*, 99 Mass. 101, to discover what of substance it possesses. Upon the first inquiry see *Moss' Appeal*, 83 Pa. St. 264, 270; *Smith's Estate*, 140 Pa. St. 344, 21 Atl. 438; *Thomson's Estate*, 153 Pa. St. 332, 26 Atl. 652, 653; *Graham's Estate*, 198 Pa. St. 216, 47 Atl. 1108; *Parker* v. *Johnson*, 37 N. J. Eq.

366 ; *Matter of Gerry*, 103 N. Y. 445, 9 N. E. 235.   But we have no need to turn aside for any such purposes.   It is enough that the language of the will creating the trust neither is, nor was when used, ambiguous or uncertain in meaning or effect.   The more recent decisions which have declared the law of this jurisdiction as to the legal effect of certain language when used in creating a situation, and the legal consequences of a situation created, did not make that law.   It was as much the law before as after them, and this Connecticut will must be read, interpreted and given legal effect pursuant to that law.

The executors present, in addition to the comprehensive claim thus far considered, certain subordinate ones, which when added together total said sum of $127,683.07.   The first of these is one to the profits, whether by sale or increase in valuation of the securities which have made up the fund, amounting, it is said, to $53,575.77.   An adverse disposition of this claim is necessarily involved in our conclusions already stated.

Among the securities which the fund has held have been stocks of certain corporations which, during the period of the trust ownership, voted to increase their capitals and give to their shareholders the right to subscribe *pro rata* at par for the new shares.   Some of the rights thus accruing to the fund were sold by the trustees for sums amounting to $15,758.41 ; others were exercised and new stock taken by the trustees.   From these transactions it is said that there were profits amounting to $50,849.45.   These two sums are now specifically claimed as belonging to the life tenant.   The precise question thus presented was decided adversely to the contention of the executors in *Brinley* v. *Grou*, 50 Conn. 66, and the underlying principle there asserted has been consistently maintained through the line of subsequent cases already cited.   That principle is, that until there has been some action by a corporation setting apart from the body of its assets some portion of them to become the property of its stockholders, and thus to pass out of the dominion of the corporation into that of

the stockholders, there is nothing in existence to which the right of the latter can attach otherwise than as it attaches to the corporate interest as a whole—nothing which can as to them be regarded as partaking of the nature of profits from the corporate investment. *Green* v. *Bissell*, 79 Conn. 547, 65 Atl. 1056; *Bulkeley* v. *Worthington Eccl. Soc.*, 78 Conn. 526, 532, 63 Atl. 351.

Applying this principle to situations where new stock is issued and the right to subscribe therefor is accorded to shareowners *pro rata*, whether that issue be based solely upon surplus assets thus capitalized, or upon surplus assets in part and payments by subscribers in part, or wholly upon subscription payments, we find that it is always true that no asset of the corporation is set apart to become the shareowner's. The corporation parts with nothing. The shareowner gets nothing which was before a part of the corporate property. He not only gets nothing in the way of tangible property, but he gets nothing in the way of intangible value. All that he acquires is some evidence of his ownership in the corporation, for which he perhaps pays more or less, or perhaps pays nothing. If he receives new stock and pays nothing, as in case of a pure stock dividend, he owns no more and no less than he did before the transaction took place. He, to be sure, has more shares, but his proportionate interest in identically the same corporate assets remains unchanged. If he exercise his right to subscribe for his *pro rata* share, and pursuant to the terms of that right pays in to the corporation the full par value of his subscription, or some lesser sum supplementing a part payment from surplus assets thus capitalized, the result is again the ownership of more shares than before, but his total ownership represented by them forms a no greater proportion of the corporate assets than he formerly held, and those assets are precisely what they were, save as they have been increased by the subscription payments to which he has made his proportionate contribution. If the true book value of the shares of stock before the increase was more than par, that value after the increase

becomes diminished by the fact that the surplus assets, which are incapable of appreciation, have to be distributed among a larger number of outstanding shares. So, if instead of exercising his right to subscribe, the stockholder sells it for its true value and his assignee steps into his place, the seller will, indeed, when the transaction has been closed, find himself with a sum of money in his pocket which he can call his own, but the certificate of stock which has remained in his strong box, while bearing the same figures as formerly, will represent as much less of true value as is measured by the money received. It is true that the new conditions created by the stock issue may, for some artificial reasons, so appeal to investors or speculators as to influence market values so that they will not express the true situation, but that situation as revealed upon the books of the corporation will nevertheless exist, since it must remain as true of corporate management as of other things, that something cannot by human agency be created out of nothing. Of course there may be declared cotemporaneously with a stock increase a cash dividend, the proceeds of which the recipient may if he chooses appropriate toward the satisfaction of his subscription obligation. This dividend may even be planned so that he may thus take advantage of it. But such dividend, if one in truth, would be an incident complete in itself and wholly independent of the stock issue transaction, and would not change that transaction's real character and consequences.

Whenever, therefore, as the result of a stock issue, of whatever form, nothing is by the corporation separated from the corporate assets to pass out, or which at the option of the shareowner may pass out, from the dominion of the corporation into that of the shareowners, no condition is created which permits of a life tenant receiving anything in hand which is not inevitably subtracted from that which, in the possession of the trustee, represents ownership in the corporation, and nothing else,—from that, therefore, which under our law is the *corpus* of the trust estate.

What the life tenant thus received would come from somewhere. It would not come from the corporation. It could only come from, or at the expense of, the fund held by the trustee before the transaction had its inception, and result in the fund's depletion as its consequence. The executors cannot, therefore, have either the proceeds of sale of, or profits derived from the utilization of, the rights under consideration.

In Massachusetts and Rhode Island, where views upon the general subject of the rights of life tenants and remaindermen similar to those held by us are entertained, similar conclusions upon the incidental question now under discussion have been reached. *Atkins* v. *Albree*, 94 Mass. 359; *Daland* v. *Williams*, 101 id. 571; *Rand* v. *Hubbell*, 115 id. 461; *Brown, Petitioner*, 14 R. I. 371; *Greene* v. *Smith*, 17 id. 28, 19 Atl. 1081.

The inequity of any other conclusion has led courts holding other views than ours upon the general subject of the rights of life tenants, to agree that the ownership of rights such as are under consideration attaches to the *corpus* of trust funds. *Moss' Appeal*, 83 Pa. St. 264, 270; *Biddle's Appeal*, 99 id. 278; *Eisner's Estate*, 175 id. 143, 34 Atl. 577; *Walker* v. *Walker*, 68 N. H. 407, 39 Atl. 432; *In re Kernochan*, 104 N. Y. 618, 11 N. E. 149; *Hite* v. *Hite*, 93 Ky. 257.

See to the same effect *DeKoven* v. *Alsop*, 205 Ill. 309, 68 N. E. 930; *Bouch* v. *Sproule*, L. R. 12 App. 385; *In re Barton's Trusts*, 17 Law Times Rep. N. S. 594.

In three instances there were new issues of stock, according to the terms of which the stockholders were permitted to have their *pro rata* share upon the payment of less than the par value thereof. The balance was made up out of the surplus of the corporation. In one case the vote was in substance to appropriate from the undivided profits or surplus for this purpose $25 for each new share of stock; in another that each subscriber be credited $10 per share out of the surplus; and in the third that each stockholder be credited with a dividend, from the surplus, of $18.75 on

each share of the new stock. The amounts so appropriated or applied, being in the whole $7,499.44, are made the subject of the final claim by the executors. The answer to the question thus presented is involved in the discussion already had, unless it be that the sums under consideration are to be regarded as cash dividends. It will be noticed that in no one of the three cases was the stockholder entitled to receive anything in hand. He was given no option to receive a dollar. Whatever form of words was used, the only thing which could result was a capitalization of surplus to the extent of the appropriations or credits allowed. No asset could by any possibility pass out from the control of the corporation; some were to be given a new character, but all were to be retained in the corporation.

The Superior Court is advised that no one of the claims presented by the executors of the last will and testament of Mrs. Lucy H. Boardman, deceased, to a share of the trust fund now in the hands of William J. Boardman, trustee, is well founded; that all of said fund as it was constituted at the death of said Lucy H. Boardman belonged to the *corpus* thereof, and that judgment be rendered accordingly.

No costs in this court will be taxed in favor of either party.

In this opinion the other judges concurred.