NATHANIEL W. BISHOP ET AL., EXECUTORS, *vs.* WILLIAM D. BISHOP ET ALS.

Third Judicial District, Bridgeport, October Term, 1908.

BALDWIN, C. J., HALL, PRENTICE, THAYER and RORABACK, JS.

The expressions "income," "net income and profits," "net income, profits and interest," and "net increase, income, profits and interest," when used in a will to describe "life uses" given by separate trusts for the benefit of children who are otherwise treated with substantial equality, mean virtually the same thing, and are intended to designate income as distinguished from principal, and not to create preferences or to discriminate between such beneficiaries.

In the absence of any testamentary provision, express or implied, to the contrary, a beneficiary for life of an aliquot part of the residue of an estate placed in trust is entitled to the use or income of his proportion of the clear residue, as that may be finally ascertained, to be computed from the death of the testator.

Bishop *v.* Bishop.

A mere direction to the executors to divide the estate as soon as may be convenient and lawful after the testator's death is not sufficient to raise an implication that the date of such division, rather than that of the testator's death, is the one from which the use or income of the life beneficiary is to be computed.

In 1907 the Adams Express Company, which was organized in 1854 as a joint-stock association under the laws of New York, issued to its stockholders, in proportion to their respective holdings, bonds to the face value of $24,000,000, and transferred securities of that face value to a trustee for their use. *Held* that whatever might be its exact legal character or status, the company might be regarded and treated as if it were a true corporation in determining the respective rights of life beneficiaries and remaindermen in these bonds, which were received by the executors pending the settlement of the estate.

As a general rule it is only cash dividends upon corporate stock held in trust that pass, under a bequest of income, to the beneficiary for life; and not even these if made in the process of liquidation or in reduction of the company's capital.

A "cash dividend," whether made in money or in property, is one which is confined to a distribution of the profits or surplus assets only; and therefore a distribution to the shareholders of the Express Company in the form of its bonds, for the payment of which, forty years hence, the entire corporate assets, if necessary, are pledged, is obviously not a cash dividend, whatever its essential character may be. Such obligations, issued to an estate pending its settlement, become a part of the principal of the estate, and as between a life tenant and the remainderman belong to the latter.

Where life beneficiaries are entitled to share in the net income of the estate from the time of the testator's death, the administration account should separate principal from income and itemize each, so that a proper division or distribution may be made, and the expenses of settlement chargeable to each fund may be deducted accordingly and the net income be thus ascertained.

In such an accounting succession taxes assessed against the net value of the property as a whole are properly chargeable to the principal, while local taxes upon the decedent's real estate accruing since his death are payable from income.

Personal property, supposedly part of the principal of an estate, was set out to a legatee upon condition that it be not judicially declared to be income. *Held* that the transfer of title was to be regarded as legally complete as soon as this court had determined that the property was principal.

A stock dividend upon shares held by a trust fund becomes a part of the principal of such fund and as such passes to the remainderman.

Argued November 17th, 1908—decided January 7th, 1909.

SUIT to determine the respective rights of life tenants and remaindermen under the will of Julia Ann Bishop of Bridgeport, in and to bonds of the Adams Express Company issued by it to its stockholders in 1907, and to one hundred and six shares of the newly issued capital stock of the Westinghouse Air Brake Company, brought to and reserved by the Superior Court in Fairfield County, *Reed, J.,* upon the facts stated in the complaint and answers, for the advice of this court. *Judgment advised in favor of the remaindermen.*

Julia Ann Bishop died October 9th, 1906, leaving a will, five children, and an estate which included one hundred shares of the Adams Express Company and four hundred and twenty-six shares of the Westinghouse Air Brake Company. Her will directed the payment of her just debts and funeral expenses by the executors, and then provided as follows:—

"Article 2. As soon after my decease as may be conveniently and lawfully done, I direct my executors to divide my entire estate into five equal portions." One of these portions she then gave to the executors in trust, to expend out of "the net income, profits and interest thereof" such sums at their discretion as they should deem best calculated to insure the suitable maintenance and support of her son Russell T. during his life, and for the suitable maintenance, support and education of his son Julian T. for his life, and with further provisions for the distribution of "net income and profits" and the final disposition of the corpus of the fund, which are without importance in the consideration of the questions presented. Two of the equal portions were given to the Knickerbocker Trust Company of New York, in trust, to keep each as a separate fund, and to pay over in semiannual payments "the net amount of the increase, income, profits and interest" of one of them to her daughter, Mary F., during her life, with remainder over to others at her decease; and "the net increase, income, profit and interest" of the other, in semiannual payments to her son

William D. during his life, with remainder over to others at his death. The remaining two fifths were given absolutely to her sons Henry A. and Nathaniel W., one to each. The two sons last named were made executors, and they are now acting in that capacity and as trustees of the one fifth of which Russell T. is a life beneficiary. The Connecticut Trust and Safe Deposit Company of Hartford has succeeded to the trust which the Knickerbocker Trust Company originally exercised. All of the five children now survive, as does the grandchild Julian.

The Adams Express Company is a joint-stock association formed and existing under the laws of New York and having its principal place of business in New York City. Its shares of stock, of which there are one hundred and twenty thousand outstanding, have no face or par value, but are quoted, bought and sold in the open market as if they had a face value of $100 each. Prior to June 14th, 1907, neither the company nor its board of managers had ever made any designation or separation of any part of its assets and property as capital, surplus, or reserved fund, but all had been kept and administered as a whole.

June 14th, 1907, the board of managers voted "that the capital and reserved fund of the Association be reduced by transferring and assigning bonds and stocks belonging to the Association, of the value of $24,000,000, to a trustee to hold for the pro rata use and benefit of the shareholders of the Association and their assigns, and by issuing and distributing among shareholders distribution bonds to represent their distributive share of said reduction and their respective interests in the stocks and bonds so transferred and assigned." It was further voted that the president, secretary and trustees, "in order to carry out said reduction and distribution of capital and reserved fund," execute and deliver to the Standard Trust Company of New York a certain deed of trust and deliver the stocks and bonds thereby transferred and assigned to it, and that the president or vice-

president and secretary, execute "the distribution bonds of the Association" to the amount of $24,000,000, face value, in the form prescribed in the trust deed, and issue and deliver to each stockholder of record on the closing of the books of the Association at 3 p. m. Thursday, June 27th, 1907, $200 face value of said distribution bonds for each share standing in his name.

The directions of this vote were complied with by the execution and delivery to said Trust Company of a certain deed of trust, the delivery to it of the stocks, bonds and evidences of indebtedness thereby transferred to it, and the issue and distribution, as provided, of the amount of bonds therein named.

These bonds were promises to pay to the bearer or holder the amount specified therein in the ordinary form of such instruments, excepting that they contained the provision that they should not create a personal liability on any shareholder, officer, manager or trustee of the Company, as a partner or otherwise, and the further provision that they should be payable solely out of the securities and property assigned and transferred to the Trust Company under the deed of trust, or, if they should prove insufficient, out of the assets of the Adams Express Company. Reference was therein made to this deed for the statement of the securities and property assigned and transferred to the trustee, and the nature and extent of the security and rights of the holders of the bonds.

By the terms of the deed of trust, which recited the authority of the board of managers, its votes in the premises, and the form of the bond determined upon by it, the Express Company assigns, transfers and conveys to the Trust Company as trustee, certain stocks, bonds and evidences of indebtedness fully described and set out. It is stated that this is done, and the instrument executed, in order to secure payment of the principal and interest of all outstanding bonds to be issued as provided, and the performance and

observance of all the covenants and conditions contained in the deed, and to declare the terms and conditions upon which the bonds are issued and received. The trust is declared to be one for the equal and proportionate benefit and security of all holders of the bonds and their coupons, for the enforcement of the payment thereof according to their tenor, and to secure the performance and observance of and compliance with the covenants and conditions of the instrument, without preference, priority or distinction in favor of any bond or bonds over others.

Then follow numerous provisions fixing the terms and tenor of the bonds to be issued, the manner of their issue and transfer, and the aggregate amount of the outstanding issue, defining the nature and terms of the trust created and the rights and powers of the parties in interest, and regulating the management of the trust. Of these, only those which might be conceived to have significance in relation to the questions here presented need be noticed. By article second of this part of the deed, the Express Company "covenants and agrees that it will duly and punctually pay or cause to be paid to every holder of any bond issued hereunder and secured hereby the principal and interest accruing thereon in gold coin of the United States of America of or equal to the present standard of weight and fineness at the dates and rate and in the manner mentioned in said bonds or in the coupons thereto appertaining, according to the true intent and meaning thereof."

Articles fourth, fifth, sixth and seventh embody the following provisions:—

"Article Fourth. The trustee shall receive and collect any and all interest, income, dividends and profits which may accrue or be declared or in any manner become due and payable on said securities and property conveyed and transferred to it as aforesaid, and shall hold and apply the same for the payment of any interest then due or accrued, or accruing up to the next succeeding date upon which the

semi-annual interest shall be payable on the bonds secured hereby, and any and all excess of such interest, income, dividends and profits so collected after providing for the payment of said interest on all the bonds issued and outstanding hereunder, shall be paid to the Company or as it may direct; but if said interest, income, dividends and profits be insufficient to pay any accrued interest, the Company shall forthwith on demand pay the deficiency to the trustee for account of the holders of bonds or coupons.

"The trustee shall be entitled to do all acts and take all steps and proceedings which in its opinion may be necessary or proper for the purpose of obtaining the payment or collection of said interest, income, dividend and profits, and shall have full power and authority to give all necessary receipts and acquittances therefor; but in case the trustee shall not take such action as is in the opinion of the managers or trustees of the company necessary to obtain or enforce the payment or collection of said interest, income, dividends and profits with all reasonable speed, the Company shall be entitled, at its own cost and expense, to take such action in the name of the trustee, provided it shall give to the trustee reasonable indemnity against any liability thereby incurred.

"Article Fifth.    The legal title to the securities and property now or hereafter assigned and transferred hereunder shall vest in the trustee for the benefit of the holders of bonds issued hereunder, subject to the following conditions:

"When the principal of said bonds becomes due and payable, the trustee shall sell and dispose of all and singular the said securities and property, in the manner herein provided, and distribute all the proceeds, including any surplus realized over the amount due for principal and interest of said bonds, as provided in Article Sixth hereof, after first reimbursing the Company any amount paid by it on account of the principal of any said bonds or coupons.

"The trustee shall invest and reinvest the securities and

property or proceeds thereof held hereunder as the trustees of the Company shall from time to time direct in writing, and said trustees may at any time require the sale of any securities or property held hereunder and the investment of the proceeds thereof in any other securities or property of the description hereinafter stated in this article as they may from time to time designate. The trustee shall from time to time, on demand of the trustees of the Company, release from the lien of this indenture and deliver to them, or upon their order, any of the securities which may at the time be held hereunder, upon the deposit with the trustee, in exchange therefor, of securities, shares, bonds, notes or obligations of any corporation or association, which shall then have a market value, or, in case of the deposit of bonds issued hereunder, a face value, equal to the value of the securities or property so released and delivered, as stated in the schedule of values delivered to the trustee simultaneously with this indenture, or in respect of securities hereafter delivered equal to their market value at the time of such delivery to the trustee, or secured by collateral having such value.

"The securities to be deposited with the trustee under this article in exchange for securities theretofore on deposit shall be [here their character is stated].

"At the time of depositing with the trustee any securities as provided in this article, other than bonds issued hereunder, the Company shall deliver to the trustee, together with such securities, a certificate signed by the trustees of the Company stating and certifying the following:

"1. The market value of the securities so deposited or of the securities held as collateral for any note or other obligation so deposited.

"2. That the association or corporation issuing the shares or liable upon the bonds or other obligations so deposited or held as collateral, or in which the securities deposited or held as collateral represent shares or interests, is in their

opinion solvent, and that no default known to them exists in the payment of any principal, interest or dividends of or upon any of such securities.

"3. That the trustees of the Company have authorized the deposit of such securities with the trustee hereunder and the execution and delivery of such certificate to the trustee.

"The trustee shall accept such certificates as conclusive evidence of the market value of the securities deposited or held as collateral, for the purpose of this article and of exchange for securities and property theretofore deposited, and that the securities mentioned in the certificates may be properly deposited with the trustee under the provisions of this indenture.

"No certificate shall be required in connection with the deposit under this Article of bonds issued hereunder, except that the trustees of the Company have authorized their deposit.

"Article Sixth.   In case default shall be made in the payment of any interest on any of the bonds issued hereunder and secured hereby, as and when such interest shall become due and payable, and such default shall continue six months, or in case default shall be made in performing or complying with any covenant or condition herein required to be performed or complied with by the Company, and such default shall continue for six months after the trustee shall have made demand in writing upon the Company, its successors or assigns, to perform or comply with the same, or, in case default shall be made in the payment of the principal of any of said bonds, when the same shall mature or otherwise become payable, then and in any and every such case, the trustee shall be entitled to sell, and upon the request in writing of the holders of twenty-five per cent. in amount of bonds then outstanding, it shall be the duty of the trustee to sell, the securities and property transferred and conveyed to it hereunder, . . .

"Upon making any sale under any such default, or in

case all or any of the said securities and property shall be sold and the security hereby created for the benefit of the bondholders be enforced pursuant to judicial proceedings, then and in any such event the principal of all the bonds which shall have been issued and shall then be outstanding, hereunder shall, forthwith, become due and payable, with the interest then accrued and unpaid, anything in the said bonds to the contrary notwithstanding; . . . The proceeds of such sale or sales by the trustee, or pursuant to judicial proceedings, shall be applied, first, to the payment of the costs and expenses of such sale, including a reasonable compensation to the trustee, its agents, attorneys and counsel, and all expenses, liabilities and advances made or incurred by the trustee in managing and maintaining the trust hereby created, and the residue shall be distributed pro-rata among the holders of the said bonds then outstanding.

"Article Seventh. In case default shall be made in the payment of any interest on any of said bonds secured hereby, as and when such interest shall become due and payable, and such default shall continue for six months, or in case default shall be made in performing or complying with any covenant or condition herein required to be performed or complied with by the Company, and such default shall continue for six months after the trustee shall have made demand in writing upon the Company, its successors or assigns, to perform or comply with the same, then, and in any and every such case, the trustee may, by notice in writing served upon the Company, its successors or assigns, declare due the principal of all of said bonds, issued under this indenture, and the same shall thereupon become and be immediately due and payable, together with accrued and unpaid interest up to the date of such declaration.

"In case of any such default continuing for the period of six months, as aforesaid, it shall be the duty of the trustee, upon the request in writing of the holders of a majority in

interest of the bonds secured hereby, and at the time outstanding, so to declare the principal of said bonds due and payable, and to give notice thereof, as aforesaid, or to refrain from making such declaration upon such terms and conditions as such holders shall deem proper; and such holders may in like manner annul or reverse any declaration already made by the trustee, anything herein to the contrary notwithstanding, provided, however, that the Company, its successors or assigns, shall not on the faith of such declaration have deposited the whole amount due on said bonds with the trustee in trust to pay the same.

"The action of the trustee, in enforcing and protecting the rights of the bondholders hereunder, shall at all times be subject to the direction and control of the holders of a majority in amount of the bonds hereby secured, and then outstanding; and such holders of a majority in amount of said bonds shall at all times have power, by an instrument in writing, executed and delivered to the trustee, to direct the trustee to waive any default of the Company hereunder (except in the payment of the principal of said bonds or any of them, when due at maturity), and any or all rights resulting therefrom, upon such terms as may be directed by the majority in such writing, shall be binding upon the trustee and all the bondholders. . . ."

By the eighth article the Trust Company is required to give to the Express Company its power of attorney and proxy irrevocable to vote upon all shares of stock in the trust fund at all corporate meetings and upon all bonds so held at all meetings of bondholders, until the security of the instrument should become enforceable, or the securities and property held under the trust should have been sold.

By the ninth article it is stipulated that the rights secured to the holders of the bonds and coupons "shall exclude and be in lieu of and exclusive of any and all right to enforce any individual liability as against any present or future shareholder, officer, manager or trustee of the Company by

reason or in respect of said bonds or coupons or this inden-
ture, or on account of the issue or execution thereof or of
any judgment thereon, and that said bonds and coupons
shall be payable solely out of the securities and property
assigned and transferred to the trustee hereunder, or, if
they prove insufficient, out of the assets of the Company;
and said holders of said bonds and coupons and their trans-
ferees, waive and release all claim to any personal liability
of the shareholders, officers, managers or trustees of the
Company, said bonds and coupons being executed and is-
sued on that express condition."

The remaining articles provide for the resignation or re-
moval of the trustee, and various matters of procedure in
the management of the trust, which possess no present im-
portance, except the following: "The trustee may be re-
moved at any time by an instrument in writing under the
hands of three-fourths in amount of the holders of the bonds
hereby secured and then outstanding; but no such removal
shall be made before default hereunder without the written
consent of the Company. . . .

"Anything in this indenture contained to the contrary
notwithstanding, the holders of a majority in amount of the
bonds hereby secured and outstanding shall have the right
from time to time, if they so elect and manifest such elec-
tion by an instrument in writing executed and delivered to
the trustee, to direct and control the method and place of
conducting any and all proceedings for any sale of the se-
curities and property covered hereby or any other action or
proceeding hereunder.

"The trustee shall be entitled to reasonable compensation
for all services rendered by it in the execution of the trusts
hereby created, which compensation, as well as its reasona-
ble expenses necessarily incurred hereunder, the Company
agrees to pay and the trustee shall have a lien therefor
upon the securities and property held by it hereunder."

The stocks, bonds and evidences of indebtedness which

passed under this deed were acquired by the Express Company from time to time from the excess of its receipts over its disbursements, and from the income of stocks and bonds owned by it, and constituted assets which had not been set aside or devoted to any particular purpose or fund.

Pursuant to the votes and action above outlined, the executors of Mrs. Bishop's will received $40,000 face value of these bonds. October 14th, 1907, they filed an administration account in which they charged themselves with them in addition to the amount of the original inventory of the estate, and also with the dividends, interest, income and other receipts of the estate to date. This account, after notice to the children, Russell, Mary, and William, and to the Knickerbocker Trust Company, was heard, approved and accepted by the Court of Probate on October 18th, 1907. None of the parties in interest who were of legal age, as all of Mrs. Bishop's children were, interposed any objection to the acceptance of this account, which was filed to comply with the laws of the State with regard to the taxes imposed upon the estates of deceased persons; but this absence of objection was upon the understanding and agreement between them that the questions now presented were to be presented to the Superior Court for determination, and that the rights of the parties were not to be prejudiced by either the acceptance of the account or the failure of the parties to appeal therefrom.

About December 1st, 1907, the executors received $800 as six-months interest on the bonds, which they now hold pending the advice of the Superior Court. Mrs. Bishop's estate is amply sufficient to pay all debts and expenses of administration without a resort to said bonds or interest.

On or about January 28th, 1908, the executors, pursuant to the direction of the will, filed in the Court of Probate a division and distribution, in part, of the assets of the estate, setting out stocks, bonds and cash in five shares, as provided in the will, each share being $126,480.16 in value,

and in this distribution they set out and distributed, among other securities, certain of the said bonds, $10,000 in face value, to the Connecticut Trust and Safe Deposit Company, as trustee for the defendant William D. Bishop; certain others, in equal face amount, to said Trust Company as trustee for the defendant Mary F. Bishop, and an equal amount to Nathaniel W. Bishop and to Henry A. Bishop. The distributions to the Trust Company in the case of both the William D. and Mary F. Bishop funds have appended to them the following note: "Less 10 $1,000 Adams Express Company Collateral Trust 4% Distribution Gold Bonds of 1907, due June 1, 1947, interest June and December—held pending decision of the courts as to whether principal or income, $8,550."

These bonds are now in the hands of the executors. In the share set out to the fund of which Russell T. is a life beneficiary, no bonds of the Express Company are included. This distribution does not designate any of the property described therein, either as part of the principal of said trusts or as part of the income thereof or of said estate, and the same was received and filed by the Court of Probate without notice to any of the parties in interest, being marked by said court "Return of Partial Distribution. Return accepted, Jan. 28, 1908."

Prior to the votes of June 14th, 1907, the stock of the Express Company had a market value of from $275 to $300 a share. Immediately after June 27th, 1907, when the right to share in the bond issue became aparted from the stock, the market value of the shares declined to about $150 a share.

In the adminstration account filed October 14th, 1907, as stated, the executors credited themselves with $1,281.27, being the amount of the succession and transfer tax laid and collected by the State of New York, the same being a tax assessed at one per cent. upon the net value of all the property of the estate subject to such tax, to wit, $128,126.95,

and being laid and collected with reference to the interest of all of Mrs. Bishop's children and said grandchild Julian, as beneficiaries under her will. All of them were in the same class and degree of relationship according to the law of New York, and said tax was laid as a single assessment in the amount named, against all of said property in the aggregate, without division or discrimination by reason of the fact that the interests of the two first named were in fee simple and of the others for life only. They also credited themselves with the sum of $1,405.37, a sum paid to the city of Bridgeport as taxes upon the list of 1906 upon real estate of the deceased located therein, and payable April 1st, 1907.

Upon the recommendation of the board of directors of the Westinghouse Air Brake Company, made at a meeting on September 11th, 1907, and the approval of its stockholders at a meeting on December 3d, 1907, the board of directors on December 11th, 1907, declared a stock dividend of twenty-five per cent., payable in the stock of the Company January 31st, 1908, to stockholders of record December 31st, 1907. Pursuant to this vote, the executors received on or about January 31st, 1908, one hundred and six shares of the capital stock of said Company, and they have since delivered the same to the distributees of the original four hundred and twenty-six shares of that stock in the distribution of January 28th, 1908, in proportion to the number of said shares then distributed to each, so that to four of the distributees twenty-five shares each of the new issue were given, and to the fifth, that in which Russell T. had a life interest, only six and one half shares were given.

*William B. Boardman,* for William D. and Russell T. Bishop, life tenants.

*Arthur M. Marsh,* for Natala W. Bishop *et als.,* remaindermen.

*William A. Redden,* for Julian T. Bishop, life tenant.

*Arthur P. Stone* of Boston, for Mary F. Bishop, life tenant.

PRENTICE, J. Mary F. Bishop, as the life beneficiary of one of the trusts created by her mother's will in a one fifth share of the latter's estate, claims to be entitled to receive in her own right one fifth of both the Adams Express Company bonds and the Westinghouse Air Brake Company stock which came into the hands of the executors as original issues, whether or not they are to be regarded as income of the testatrix's estate in that sense which would entitle her as life tenant to share in their division. William D. Bishop, the life beneficiary of the trust similarly created in another one fifth, asserts a like claim. These two join with the *cestuis que trust* under the third trust created by the will, in asserting that the Express Company bonds are to be regarded as income of the testatrix's estate in which they are entitled to share pursuant to the trust provisions of the will regulating the appropriation of income.

The first of these two claims rests solely upon the language of the will, which, in the case of the two life beneficiaries first mentioned, provides that the trustee in the one pay over to the life tenant "the net amount of the increase, income, profits and interest" of the share, and in the other "the net increase, income, profit and interest." An examination of the will shows that the testatrix, in seven different places in it, used language descriptive of the interest of life tenants, and that five different forms of expression were employed by her for that purpose. Twice it is simply "income"; twice "net income and profits"; once "net income, profits and interest"; and once each the phrases already recited. In the directions to the executors as trustees, they are directed to collect "the income, profits and interest" of the fund in their hands; in those to the Knickerbocker Trust Company, it is directed to collect "the increase, income,

profits and interest." In the case of each of the two trusts in question, in respect to which the more extended phraseology is used, the testatrix describes that which is given to the life tenants as "the life use" of the trust fund. The testatrix's general scheme for the bestowment of her bounty evidences a distinct purpose to treat her five children and their children with equality, except so far as she was led to create ordinary trusts with respect to two of them and a spendthrift trust with respect to a third, with the natural incidents of such trusts. *Wolfe* v. *Hatheway*, 81 Conn. 181, 70 Atl. 645. It is thus evident from the will that the testatrix used the differing forms of expression noticed with no intent to create preferences or to discriminate between the several life beneficiaries, and that whichever of the formulæ she used to express her meaning, she thereby intended to comprehend income as distinguished from principal, and that only. The life tenants place special emphasis upon the use of the word "increase." In *Brinley* v. *Grou*, 50 Conn. 66, 77, we said that the phrase "the rents, dividends, increase and income" meant no more in the will in litigation than "income." The same is equally true of the language here used.

The second claim resolves itself into two propositions, to wit: (1) that the life beneficiaries under each trust are entitled to the benefit of one fifth of the net income of the testatrix's estate from the time of her decease, and (2) that the Express Company distribution partook of the character of what is called a cash dividend, and is therefore to be regarded as income.

"It is well settled in this State, as it is in many other jurisdictions, that 'where there is a bequest of the whole, or of an aliquot part, of the residue of an estate to a legatee for life, remainder over, and no time is fixed by the will for the commencement of such life use, the legatee is entitled to the use or income of the clear residue so bequeathed, as the same may at last be ascertained, to be computed from

the death of testator.' " *Webb* v. *Lines,* 77 Conn. 51, 53, 58 Atl. 227; *Bancroft* v. *Security Co.,* 74 Conn. 218, 222, 50 Atl. 735; *Lawrence* v. *Security Co.,* 56 Conn. 423, 439, 15 Atl. 406; *Bartlett* v. *Slater,* 53 Conn. 102, 106, 22 Atl. 678. This will contains no express provision upon the subject. If any time other than that of the testatrix's decease is fixed by it as that from which income for the benefit of life beneficiaries is to be computed, it results by implication from the facts that the executors were directed to divide the estate as soon after the testatrix's decease as might be conveniently and lawfully done, that shares thus ascertained were given to the several trustees, and that it was either' the income thereof or sums set out of such income which the trustees were either required or permitted to pay to the *cestuis que trust.* That these matters are not sufficient to raise an implication of a direction contrary to the general rule stated, clearly appears from the consideration given to this subject in *Bancroft* v. *Security Co.,* 74 Conn. 218, 222, 50 Atl. 735. The life beneficiaries are therefore right in this branch of their claim.

Preliminary to the question involved in the second proposition, is one as to the character of the Express Company. It was organized in 1854 under the statute laws of New York as a joint-stock association. It is an ·association of individuals in the nature of a partnership and possessing the element of personal liability. The courts of New York have apparently had difficulty in defining the exact status and character of associations similarly organized. They have, however, said that almost the full measure of corporate attributes has been bestowed upon them until the difference, if there be one, is obscure, elusive, and difficult to see and describe. *People ex rel. Winchester* v. *Coleman,* 133 N. Y. 279, 31 N. E. 96; *People ex rel. Platt* v. *Wemple,* 117 N. Y. 136, 22 N. E. 1046. In *Lockwood* v. *Weston,* 61 Conn. 211, 215, 23 Atl. 9, we said of the shares of stock of similar associations, that for all practical purposes, and so

far as the question of taxation was concerned, we were of the opinion that they should be considered and treated as if they were shares of stock in private corporations. The same is equally true of the shares held by the stockholders of the Adams Express Company as representing their interests in the assets of the association, and as defining their relation to them and their rights resulting from the incidents of its management, in so far as any question here presented is concerned. The association has property devoted to and utilized in the conduct of its business which serves as its capital, and is called its capital, although the precise amount of it may not be easily ascertainable. The managers are authorized to declare dividends out of the profits to such extent as they may from time to time determine. There is no question about the existence of assets which would have justified the division to the shareowners of $24,000,000 out of accumulated profits and without encroaching upon anything which could be called its capital fund. The only question is whether such a division and distribution was made as to entitle life beneficiaries to its fruits. Into its determination there can enter no factor arising from the peculiar character of the Company to differentiate the situation in any essential particular from that which would be presented were it a true corporation. *D'Ooge* v. *Leeds*, 176 Mass. 558, 57 N. E. 1025.

The general rule, subject, perhaps, to possible exceptions, is that persons having a right to the income of trust funds invested in stocks are entitled to the enjoyment of those dividends declared by the directors of the respective corporations which partake of the character of cash dividends, not including, however, those which may be so declared in the process of liquidation or reduction of capital, and that their rights are limited to such dividends. *Smith* v. *Dana,* 77 Conn. 543, 548, 556, 557, 60 Atl. 117; *Boardman* v. *Mansfield,* 79 Conn. 634, 637, 66 Atl. 169. Cash dividends, as that term is applied in this connection, include all distri-

butions of the surplus assets of a corporation, whether the same be in the form of cash or property, which are made to shareholders pro rata through the medium of dividend declarations in such manner that the assets so distributed are aparted from the body of the assets of the corporation to become the property of the shareholders, and thus pass out of the dominion and control of the corporation into that of the shareowners. *Boardman* v. *Mansfield,* 79 Conn. 634, 639, 66 Atl. 169; *Green* v. *Bissell,* 79 Conn. 547, 552, 65 Atl. 1056.

In the present case what the stockholders received in hand was the bonds of the corporation—its obligations, therefore, and not its assets. A money dividend declared creates a debt. *Beers* v. *Bridgeport Spring Co.,* 42 Conn. 17, 25. It is quite possible, therefore, that it would not necessarily militate against the validity of a cash dividend declaration that it provided, as an incident of it, for the issue of evidences of indebtedness, provided that proper conditions and limitations were observed. It is unnecessary, however, for the purposes of this case, to determine this question, or to attempt to formulate the principles applicable to such a situation, since the conditions and limitations which must attend any such transaction in order that its character as a cash dividend declaration may be preserved, are here palpably absent. Such a dividend by a corporation can be declared out of surplus assets only. It will not be permitted to reach the capital. *Davenport* v. *Lines,* 72 Conn. 118, 128, 44 Atl. 17; *Smith* v. *Dana,* 77 Conn. 543, 553, 60 Atl. 117. The authority of the managers of this Company is expressly limited to the declaration of dividends out of profits, and no one would venture to assert that their right to distribute all the assets of the association in the form of dividends declared, was greater than that of corporation directors to do the same thing. The bonds issued to the stockholders are its unlimited obligations. As such, they are a charge upon all the assets of the

Company. Their holders are empowered, in case of need, to exhaust its entire property in their satisfaction, leaving the shareholders nothing to give value to their stock. Clearly a distribution of income or profits cannot be made to embody such contingencies, and as clearly, if it could, some adjustment of accepted principles would be necessary to protect the rights of remaindermen against those of life tenants.

But the life tenants contend that the bonds are only one feature of a larger transaction, which must be looked at and judged as a whole. And they say that when the action of the Company which involved the issue of the bonds as one of its incidents is examined in its entirety and with a correct appreciation of the interrelation of the bonds and their collateral, and of the rights of the parties created by the trust indenture, it will be found that it presents all the essential characteristics of a distribution of surplus assets such as satisfies the requirements of a cash dividend. Certain of the provisions of the trust instrument are pointed out in support of this position. The remaindermen, on the other hand, indicate several of its features as affording a demonstration that no asset of the Company has been set out to become the property of shareholders, and so aparted from its general assets as to pass out of its dominion and control into that of the shareholders. They insist that under the agreement there is no item of the Company's assets concerning which it can be affirmed that shareholders now have or ever will have any control over it or property in it, or now have or ever will have a right to the proceeds of its sale either directly or indirectly. It requires no very careful examination of the trust deed to appreciate the force of this contention. But there is no occasion to pursue the line of inquiry thus suggested and thus cumulate reasons, since it is clear that there is nothing in the deed which serves to qualify or limit that provision of the bonds already noticed which makes them payable, in case of need, out of

any of the Company's assets and thus a contingent charge upon all such assets down to the last penny of them. This condition being present, it cannot be said that the Company's action which brought the bonds into the hands of the stockholders was one in the nature of the declaration of a cash dividend.

Counsel for the remaindermen have attempted to fix the character of the transaction. It is suggested that it constituted either a reduction of capital and a return of a part thereof to the stockholders, or a capitalization of certain of the Company's assets by the virtual creation of preferred stock. Another pertinent query would be whether or not it was anything more than it purported to be upon its face, to wit, an issue of the obligations of the Company secured by collateral, with certain unusual provisions as to rights in respect to the collateral and its appropriation reserved to the assignor or granted to the trustee or the bondholders. We, however, have no occasion to enter upon any of the lines of inquiry thus indicated. It is immaterial to the claim of these life tenants what the essential character of the transaction was, provided it was not the declaration of a cash dividend.

As the life beneficiaries are entitled to share in the net income of the testatrix's estate from the time of her decease, the administration account filed October 14th, 1907, in which there was no separation of principal from income items, is inadequate for all purposes. It serves to disclose the total amount of the estate and income funds in the hands of the executors, but does not reveal what of that total is to be regarded as principal and what net income. A correct adjustment of the rights of the parties requires the ascertainment of these two factors of the total funds in hand, the first for the purpose of the division and distribution under article two of the will, and the second for the disposition of net income. To this end a separate accounting as to principal and income is necessary. In such

an accounting the Connecticut succession tax and New York State tax are properly chargeable to the principal account. The item for taxes paid to the city of Bridgeport is chargeable to the income account.

As the one hundred and six shares of the Air Brake Company stock form a part of the principal of Mrs. Bishop's estate, it is apparent that the division made of that stock proceeded upon a mistaken theory and resulted unjustly to the Russell T. Bishop share, and too favorably to the other shares.

The partial distribution of personal estate filed January 28th, 1908, is to be interpreted as setting out to the Connecticut Trust and Safe Deposit Company, as trustee of the two shares of which Mary F. and William D. were the respective life beneficiaries, the items of property enumerated in the schedule of property assigned to each of these shares, including the Adams Express Company bonds, subject only to the condition attached to these bonds, that they be not judicially declared to be income. As that condition must fail, the transfer of the title to these bonds is to be regarded as having been equitably complete, carrying with it the right of the life tenants to enjoy the income thereof which has accrued since the date of the distribution.

The Superior Court is advised to render its judgment of advice that both the one hundred and six shares, new issue, of the capital stock of the Westinghouse Air Brake Company, and the $40,000, par value, of Adams Express Company bonds, form a part of the principal of Mrs. Bishop's estate; that the language of the trust provisions of her will whereby income is disposed of in favor of life beneficiaries comprehends the just proportion of the net income of her estate from the date of her decease; that the distribution of January 28th, 1908, was effective to set out to the Connecticut Trust and Safe Deposit Company, as trustee, the Adams Express Company bonds therein alloted to the two shares of which Mary F. Bishop and William D.

Bishop are the respective life beneficiaries; that these beneficiaries are entitled to the income which has accrued thereon since said distribution was made; and that the sum of $1,405.37 paid by the executors to the city of Bridgeport for taxes is to be charged by them against income, while the sums of $3,722.22 and $1,281.27 paid to the States of Connecticut and New York, respectively, are to be charged against principal.

No costs in this court will be taxed in favor of any party.

In this opinion the other judges concurred.