# CASES DECIDED

BY THE

# SUPREME COURT

OF THE

# TERRITORY OF HAWAII

---

H. FOCKE AND H. M. von HOLT, TRUSTEES UNDER THE WILL AND OF THE ESTATE OF JAMES GAY, DECEASED, *v.* LLEWELLYN NAPELA GAY, REGINALD ERIC GAY, ARTHUR FRANCIS GAY, ALICE MARY K. RICHARDSON, HELEN FANNY GAY, FRIDA GAY; EVA GAY, A MINOR; BEATRICE GAY, A MINOR; SONNY JAMES MOKULEIA GAY, A MINOR; MICHAEL VANNATTA K. GAY, A MINOR; LLEWELLYN NAPELA GAY, A MINOR; ALBERT GAY HARRIS, A MINOR; WALTER WILLIAM HOLT, A MINOR; ALICE K. HOLT, A MINOR, AND ETHEL FRIDA HOLT, A MINOR.

No. 1273.

APPEAL FROM CIRCUIT JUDGE FIRST CIRCUIT.
HON. J. J. BANKS, JUDGE.

ARGUED MARCH 22, 23, 24, 1921.                    DECIDED APRIL 5, 1921.

COKE, C. J., KEMP AND EDINGS, JJ.

WILLS—*life tenants and remaindermen—rule in Howe v. Earl of Dartmouth.*

> Where personal estate is given in terms amounting to a general residuary bequest to be enjoyed by different persons in succession it is presumed to be the intention of the testator that such of his personalty as is of a wasting or perishable nature is to be converted in such way as to produce capital of a permanent nature bearing interest unless upon a construction of the will it appears that the testator had a different intention.

SAME—*same*—*provisions which negative the presumption of intention to convert.*

> Directions by a testator to his trustees to carry on a ranching business, so long as it can be done so profitably, on a leasehold devised to them in trust to be enjoyed by different persons in succession, and investing them with a discretionary power to sell the leasehold when in their discretion they think that a sale would by reinvestment of the money realized from such sale be beneficial and inure to the benefit of or increase the trust estate, are inconsistent with an intention that the leasehold should be converted.

### OPINION OF THE COURT BY KEMP, J.

This proceeding was commenced in behalf of the complainants as trustees under the will and of the estate of James Gay, deceased, by a bill in equity praying for instructions as to their duties as trustees under said will. All parties now in being who are interested in the trust estate were made respondents. For convenience the minor respondents above named will be referred to as remaindermen and the other respondents as life tenants. The remaindermen are represented by a guardian ad litem, their interests being separate from and opposed to the interests of the life tenants. The point at issue is whether certain wasting assets (leaseholds) should have been, or what remains of them should be, preserved by amortization or otherwise for the benefit of the remaindermen. The remaindermen contend that the value of the leaseholds and all additions and increase thereto constitute the corpus of the estate and should be preserved

for their benefit, while the life tenants contend that it was the intention of the testator as shown by the terms of his will that his trustees should retain the corpus of the estate in the form in which he left it, paying to them all the income derived therefrom, including rents from sub-leases even though by so doing the estate may entirely waste away and leave nothing to the remaindermen at the termination of the trust. A decree was entered by the circuit judge adverse to the claims of the remainder-men and in accordance with the claims of the life ten-ants, from which decree the remaindermen have ap-pealed to this court.

The testator made his will dated May 25, 1893, a copy of which is attached to the complaint. After providing for the appointment of his wife, Mary Ellen Gay, and his friend, Hermann Focke, to be executor and executrix of his will and also trustees of his estate under the will and directing them to pay all his just debts and funeral expenses, the will provides:

"I hereby give, devise and bequeath unto Mary Ellen Gay and my friend Hermann Focke all my estate real personal or mixed and wheresoever situate in trust never-theless for the uses and purposes hereinafter set forth, that is to say: to pay the rents income issues and profits arising from and out of my said estate to my wife Mary Ellen Gay for the term of her natural life, and to be applied by her for the support of herself and the support maintenance and education of my children born of the body of my said wife Mary Ellen. And from and after the death of my said wife I direct my said trustees Hermann Focke and his successor in said trust to pay the rents, income, issues, and profits arising from and out of said trust estate as follows: one half thereof for the sup-port and maintenance of my sons Llewellyn Napela Gay, Reginald Eric Gay and Arthur Francis Gay share and share alike; and as to the other part thereof to pay the same for the support maintenance and education of my

daughters Alice Mary K. Gay, Ethel Pauline N. Gay, Helen Fanny Gay, and Frida Gay, share and share alike.

"And from and after the death of all my children born of the body of my said wife Mary Ellen I direct my said trustee or his successor to convey one half of said trust estate and all additions or increase thereto, unto the children of my sons Llewellyn Napela Gay, Reginald Eric Gay and Arthur Francis Gay share and share alike and the child or children of any deceased child to take the parents share. And as to the remaining portion of said trust and all additions or increase thereof, I direct my said trustee or his successor in said trust to convey the same unto the children of my said daughters, Alice Mary Gay, Ethel Pauline N. Gay, Helen Fanny Gay and Frida Gay, share and share alike, and the child or children of any deceased child to take the parents share.

"And I direct my said trustee or his successor in the event of the death of any of my children born of the body of my said wife Mary Ellen Gay to pay the share or portion of the income belonging to such child to the heirs that may survive such child dying."

Then follows a power of appointing new trustees and the will continues:

"It is my wish and I hereby direct that my said trustees or their successors or successor, shall manage, conduct and carry on the business of ranching and stock raising at Mokuleia on the Island of Oahu, so long as it can be done so profitably, and without loss; and I hereby empower them or their successors or successor at any time when in their discretion they think that a sale of all the property at said Mokuleia, would by reinvestment of the money realized from such sale of said property be beneficial and inure to the benefit of or increase the trust estate created under this will, to sell and convey said property at Mokuleia free and barred of the trust created by this will."

The testator died three days after making his will leaving surviving him his wife and the three sons and four daughters named in the will, the youngest of which

was three or four years of age and the eldest about sixteen years of age. His wife died in 1895 and his daughter Ethel died in 1902 unmarried. The will was duly admitted to probate soon after the death of the testator. The complainants are the present trustees of the estate devised by the will. At his death the testator's estate, as shown by the inventory filed in the probate proceeding, consisted of the following property: (1) a lease dated March 1, 1876, from the commissioner of crown lands of the government of Hawaii to the testator of the ahupuaa of Humuula, Island of Hawaii, comprising an area of about 1200 acres for 25 years from date, expiring March 1, 1901, but prior to testator's death extended for a term of seven years, or until March 1, 1908, at a nominal rent or rent free (this lease was valued at the inception of the trust at $5000 and will be referred to herein as the Ookala lease); (2) a lease dated May 27, 1884, from J. P. Mendonca to testator of about 2500 acres of land at Mokuleia, Waialua, Oahu, for 50 years from May 1, 1884, expiring May 1, 1934, at an annual rent of $1250 and taxes (this lease was valued at the inception of the trust at $7500 and will be referred to herein as the Mokuleia lease); (3) cattle, horses, mules, chickens, farm implements, household furniture, etc. (The horses and mules were valued at the inception of the trust at $2310; the value of the cattle, chickens, implements and furniture does not so far as we are able to ascertain appear in evidence); (4) cash in hand of agents $816.59. There was no real estate. The estate at the inception of the trust had a value, the complaint alleges, of $20,000 or thereabouts. The Ookala lease was cultivated to sugar cane by the Ookala Sugar Company under a sublease made by the testator in his life time and afterwards renewed by the trustees for the full term of the head lease. The sublease reserved a part of the sugar

grown on the lands as rent in kind from which the trustees received for the years 1893-1908, both inclusive, a total of $34,854.34. There was no rent paid by the trustees to the government, their lessor. The testator resided on the Mokuleia lease and there conducted a ranching business on the greater part of the land and subleased the remainder. At the time of his death he was receiving from subleases of portions of the Mokuleia lease a total annual rental of $2723.50. The trustees under the power contained in the will carried on the testator's ranching business from the date of his death until some time in the year 1906 when the livestock and moveable assets used in connection with the ranching business were sold realizing $4065 net. This sum has been invested by the trustees and the investment held by them as corpus of the estate. On December 9, 1898, a portion of the Mokuleia lease containing an area of about 800 acres was leased by the trustees to B. F. Dillingham for the balance of the term of the head lease at a rental of five per cent. of the sugar or the proceeds thereof grown thereon. The sublease to B. F. Dillingham was assigned to the Waialua Agricultural Company, and on July 2, 1902, the trustees subleased to the Waialua Agricultural Company for the remainder of the term of the head lease 65 acres more of the Mokuleia lease at a like rental as in the lease to B. F. Dillingham. On or about April 28, 1906, when the ranch stock was sold the rest of the Mokuleia lease was subleased by the trustees to others for fixed annual rentals and for the remainder of the term of the head lease. All of the Mokuleia lease is now sublet. The approximate total gross rent from the subleases of the Mokuleia lease beginning with the year 1894 and including the year 1919 is shown to have been $281,033.76. From this total the trustees have paid to Mr. Mendonca, their lessor, $1250 annually for 26 years,

or $32,400, leaving $248,533.76, from which of course such expenses as court costs, trustees' commissions, etc., the amount of which is not shown, should be deducted in order to ascertain the total. net proceeds of said sub-leases. The trustees paid out yearly all cash received by them from every source except the sale of livestock and ranch moveable assets, which netted $4065 as hereto-fore stated, first, to Mrs. Gay during her life time and after her decease to testator's children. The Ookala lease, as already stated, has expired. There is nothing left of this part of the estate to represent it, all of the net proceeds received from the sale of sugar, the rent in kind, having been paid by the trustees to the tenants for life. If the trustees' method of administering the trust is continued the same fate awaits the Mokuleia leasehold in 1934 unless all of testator's six children now living, the youngest of whom will be about 45 and the eldest 57, die before that date. Evidence adduced at the hearing establishes a present sale value of the Mokuleia lease of $87,000 to $90,000, a value which is decreasing about $5000 annually. No evidence, other than the appraise-ment filed in the probate proceeding, of the value of either of said leaseholds at the date of the testator's death is shown.

The trustees allege in their complaint that they have "been advised by counsel that it is uncertain and doubt-ful from the language used in the will of the testator what the testator's intentions were as to the respective rights in the estate of the life tenants and remaindermen and that it is a matter of uncertainty and doubt whether under the provisions of said will and in view of the fact that the principal assets of the trust estate, namely, the said Mokuleia and Ookala leaseholds, were of a wasting and diminishing nature the trustees of the said estate were authorized in the past or will be authorized in the

future to pay out all the net rents, income, issues and profits of the said estate to the life tenants without making provision out of said rents, income, issues and profits for the preservation of the corpus of the said estate for the benefit of the remaindermen, or whether there should not have been retained in the past and should not in the future be retained out of the said rents, income, issues and profits such sums as may be necessary for the purpose of restoring for the benefit of the remaindermen the capital or corpus of said estate to the value thereof at the death of the testator," and it is to procure the advice of the court on the question thus raised that this proceeding was instituted.

As will appear from a consideration of the question presented our decision must turn principally upon the question of whether or not the rule laid down in *Howe* v. *Earl of Dartmouth,* 7 Ves. 137 (1802), and ever since known by the name of that case, is applicable to this case. There the testator gave all his personal and landed estate to one for life and to others afterwards. The will contained no language which the court could say amounted to a specific bequest of such personal estate as was the testator's at the time of his death. Some of the estate at the time of the testator's death was invested in wasting assets (long and short annuities) and some in unauthorized securities (bank stock). Held, that these wasting assets are to be converted in such way as to produce capital, bearing interest.

The rule as understood and applied by the English courts has been more clearly stated in later cases, a few of which we will now notice.

In *MacDonald* v. *Irvine,* 8 L. R. (Ch. Div.) 101 at p. 121, Lord Justice Thesiger made a short and very lucid statement of the rule as follows: "The rule itself is a simple one, founded upon the presumption, that where

personal estate is given in terms amounting to a general residuary bequest, to be enjoyed by persons in succession, such persons are to enjoy the same thing in succession, and effectuating the presumed intention of the testator by the conversion into investments approved by the court of so much of the personalty as is at the death of the testator of a wasting, or perishable, or insecure nature, and also of reversionary interests." In *Lichfield* v. *Baker*, 2 Beav. 481, 483 (48 Eng. Rep. (Repr.) 1267), is to be found another very clear statement and application of the rule in the following language: "The only point on which I need call on the plaintiff's counsel to reply, is on the extent of relief now to be granted. As to the other question, I take this to be the rule of the court, that when a testator has given an estate, or the residue of an estate, to persons in succession, as to one for life, with remainder to another person, the court presuming that the testator intended that the remainderman should have something, will so deal with the property, if it be a property that is wearing out and may terminate during the life estate, as to secure the accomplishment of that intention, and give the remainderman something; for that purpose it will convert the perishable into a permanent property, and give the income which arises from it to the persons entitled for life in succession, and preserve the capital for the person entitled in remainder. That is the rule; and the court only acts upon the general intention of the testator, that something should be given to the person who is the donee in remainder; but if, upon the construction of the will, it appears the testator had another intention, that is to say, an intention to give to one or more persons who are to take for lives or during a succession of lives, the enjoyment of the property in the state he left it at the time of his death, then the court will carry that in-

tention into effect; and every one of the cases which have been cited, and every case which can arise, will turn upon this question of construction, whether you can find upon the face of the will an intention that the legatee for life shall enjoy the property in the way in which it stood at the testator's death, even to the extent of defeating the testator's intention to bequeath something to the remainderman. I believe that in all the cases which have been cited in opposition to the conversion, there have been words clearly indicating, from the testator's description of the property or some other circumstance, that the testator intended the donee to enjoy it for life, in the same way as it stood at his death." In *Pickering* v. *Pickering*, 4 My. & Cr. 289 (41 Eng. Rep. (Repr.) 113, at 116), it is said: "All that *Howe* v. *Lord Dartmouth* (7 Ves. 137) decided—and that was not the first decision to the same effect—is that, where the residue or bulk of the property is left *en masse,* and it is given to several persons in succession as tenants for life and remaindermen, it is the duty of the court to carry into effect the apparent intention of the testator. How is the apparent intention to be ascertained if the testator has given no particular directions? If, although he has given no directions at all, yet he has carved out parts of the property to be enjoyed in strict settlement by certain persons, it is evident that the property must be put in such a state as will allow of its being so enjoyed. This cannot be, unless it is taken out of a temporary fund and put into a permanent fund. But that is merely an inference from the mode in which the property is to be enjoyed if no direction is given as to how the property is to be managed. It is equally clear that, if a person gives certain property specifically to one person for life, with remainder over afterwards, then, although there is a danger that one object of his bounty will be defeated by the

tenancy for life lasting as long as the property endures, yet there is a manifestation of intention which the court cannot overlook."

It is with the principle announced in the above cases in mind that the will is to be examined, from which we gather that it is after all a question of intention and the rule in *Howe* v. *Earl of Dartmouth* is founded on what is presumed to be the intention of the testator where an estate is given to one for life and afterwards to others. The testator's presumable intention is that there shall be equality of enjoyment where there are no directions as to how the estate shall be enjoyed. It is the intention presumed by law in the absence of any contrary intention expressed by the testator, and being only a presumption of intention, it must give way to any intention expressed by the testator. When once you have arrived at the intention of the testator you must give effect to it notwithstanding the rule in *Howe* v. *Earl of Dartmouth*. Any other conclusion would be in conflict with our own decisions. *Mercer* v. *Kirkpatrick*, 22 Haw. 644; *Fitchie* v. *Brown*, 18 Haw. 52; *Rooke* v. *Queen's Hospital*, 12 Haw. 375.

Counsel for the life tenants argue that this will is taken out of the rule in *Howe* v. *Earl of Dartmouth* by provisions in it which they say clearly show that it was testator's intention that his estate should be held by the trustees in the state in which he left it, paying the rents, income, issues and profits arising from and out of it to them, while the guardian ad litem for the remaindermen argues that there is nothing in the will which distinguishes it from the will in that case. From the fact that the will provides for *rents* to be paid to the life tenants and the further fact that the testator had no real estate the life tenants argued that the word "rents" could apply only to leaseholds and that the obligation to convert

is thereby negatived. They cite *Goodenough* v. *Trema-mondo,* 2 Beav. 512 (48 Eng. Rep. (Repr.) 1280). There the will, which was not executed so as to pass real estate, after bequeathing specific legacies, provides: "And as to all the rest, residue and remainder of my estate and effects whatsoever and wheresoever, I give, devise and bequeath the same unto Anthony Angelo and Charles John Lawson, their executors, administrators, and assigns, in trust to permit the *rents,* issues, profits, interest, and annual proceeds thereof to be received and taken by my said son Richard Collier Andree, for and during the term of his natural life, for his own use and benefit; and from and after his decease, upon trust for Ann and Sophia, the two daughters of my said son Richard Collier Andree, when they shall attain the age of twenty-one years, equally to be divided between them, share and share alike. And I empower my said trustees and executors, after the death of my said son Richard Collier Andree, to apply the *rents,* interest, profits, and annual proceeds of my said residuary estate and effects, for and towards the maintenance and education of the said Ann and Sophia Andree, until their respective shares shall become vested." Part of the estate consisted of a leasehold. The master of the rolls said that he could not declare this to be a case of conversion without striking out altogether the word "rents" which was twice repeated in the will and it appeared that there was no other property belonging to the testator except the leaseholds to which the term "rents" was applicable. Other cases are cited in support of this contention but this one seems to be the most nearly in point of any.

The case at bar is distinguished from *Goodenough* v. *Tremamondo* primarily by the fact that the will in that case was not executed so as to pass real estate, while the will in the case at bar was not so restricted although the

testator owned no real estate at the time of his death. Under these circumstances we cannot say that the word "rents" refers to anything more than the real estate which the testator might have acquired between the making of his will and his death and which would have passed by his will in the form he made it had he acquired any.

Our conclusion as to the effect of the use of the word "rents" is supported by the decision in *Pickup* v. *Atkinson,* 4 Hare 624 (67 Eng. Rep. (Repr.) 797), where, after a specific gift of certain leasehold houses to the testator's wife for life with remainder over to his nephew, the testator bequeathed the "rents and profits, dividends and interest" of all the residue of his property to his wife for her life with gift over of the whole of the residue after her decease to other persons, and there was no freehold. The vice-chancellor, in discussing the question, said: "If the use of the word 'rents' in one case, with reference to leaseholds not specifically bequeathed, is to be taken as sufficient evidence that the tenant for life of the residue was intended to enjoy the leaseholds in specie, I do not know how to stop short of the conclusion that any other word by which income may be described is to have the same effect with reference to the property in respect to which it is paid. The use of the word 'dividends,' for example, in another case, ought to be admitted as sufficient evidence that every portion of the residue, though not specifically bequeathed, the annual profits of which are returned under the name of dividends, was also intended to be enjoyed in its existing state, which would include every species of property yielding dividends from consols, which the court considers a permanent fund, down to the lowest mercantile security: and the same argument in strictness would apply to the word 'interest' where the property yielded income in the form of interest. It appears to me impossible to admit that conclusion. I think

the correct reasoning upon the words 'rents and profits, dividends and interest' of a general residue, considered alone, must be analogous to that which is applied to the residue itself.  The mere enumeration of particulars in the latter case does not give a specific character to the bequest, because the whole clause is in effect a mere residuary bequest.  I think the same observation applies to a case like this; the enumeration of particulars of income being nothing more than a gift of the income of the residue, which means income only.  This conclusion appears to me to be put beyond dispute when it is considered that the words 'rents, profits, dividends and interest' in this case mean rents, profits, dividends and interest, not of the property the testator then had, but of such property, real, personal or mixed, as he might happen to have at the time of his death. * * * The only two cases which bear any analogy to the present are *Pickering* v. *Pickering* and *Goodenough* v. *Tremamondo,* (2 Beav. 512).  In *Pickering* v. *Pickering* the word 'rents' occurred; but it does not appear to me that the word was relied upon as alone constituting a ground for preserving the property in specie.  There are other and very elaborate reasons given for that conclusion.  In *Goodenough* v. *Tremamondo* the word 'rents' occurred twice; and Lord Langdale appears to have thought that the use of it the second time was conclusive evidence that the testator treated his property as unconverted when the estate in remainder fell into possession, and therefore that the legacy was specific in the direct sense of that term.  And he says, further, there was no other property belonging to the testator, except the leaseholds, to which the term 'rents' was applicable, which shows that he considered the bequest as specific in the strict sense of that term.  In this case any property, freehold or leasehold, to which the testator might have been entitled at his death would satisfy the gift; and that,

in my opinion, shows that the testator could not have had any particular object in his mind to which the direction was applicable, but that he referred to the income of his property generally." See also *Chambers* v. *Chambers,* 15 Sim. 183 (60 Eng. Rep. (Repr.) 587); *Morgan* v. *Morgan,* 14 Beav. 72 (51 Eng. Rep. (Repr.) 214); *Mills* v. *Mills,* 7 Sim. 501 (58 Eng. Rep. (Repr.) 929); *Boardman* v. *Mansfield,* 79 Conn. 634 (66 Atl. 169, 12 L. R. A. (N. S.) 793-6).

But the life tenants do not rely alone or principally upon the use of the word "rents" to support their contention. Their main argument is based upon that portion of the will which directs the trustees to carry on the business of ranching at Mokuleia so long as it can be done profitably and without loss and invests them with a discretionary power to sell the property at Mokuleia. As applied to the Mokuleia lease we think their reasoning is sound. If the conversion was required at all it must take place as soon after testator's death as may be. The direction to the trustees to "manage, conduct and carry on the business of ranching and stock raising at Mokuleia" and the discretion with which the testator invested the trustees in the matter of selling "the property at said Mokuleia" are both inconsistent with an intention that the property was to be converted, for if they had a right to retain the property until "in their discretion they think that a sale of all the property at Mokuleia would by reinvestment of the money realized from such sale of such property be beneficial and inure to the benefit of or increase the trust estate created under the will" they may retain it for years, or, indeed, may never convert it at all, and if so they are only exercising the discretion given to them by the will. *In re Bates,* L. R. 1907 (1 Ch.) 22; *Alcock* v. *Sloper,* 2 Myl. & K. 699 (39 Eng. Rep. (Repr.) 1111).

Neither do we see any merit in the contention of the remaindermen that since the trustees ceased to carry on the ranching business at Mokuleia and subleased the lands they in effect sold the head lease to be paid for in instalments and that the amounts received for the sublease are corpus instead of income. If, as we have concluded, the trustees were authorized under the terms of the will to retain the head lease whatever sums they received for its use were income and the life tenants entitled to receive it.

But what we have said as to the effect of the above provisions upon the right of the trustees to retain the Mokuleia lease has no application to the Ookala lease and there is no other language in the will which in our opinion has any reference to the manner in which the Ookala lease was to be enjoyed. The circuit judge apparently considered that the question presented related entirely to the management of the estate in the future and dismissed the Ookala lease with the statement that it had already expired. Since the trustees ask for instructions as to their duties in the execution of the trust and that all proper accounts may be taken and all necessary directions given for carrying the testator's intention into execution we think the whole matter should be settled in this proceeding. The restoration of the corpus of the estate represented by the Ookala lease is we think as much involved as if the case had been commenced by the remaindermen on a bill for an accounting. There are not, however, before us sufficient facts to enable us to enter a decree.

We think, therefore, that the cause should be remanded with instructions to the circuit judge to modify the decree appealed from so as to require of the trustees an accounting in accordance with the views herein expressed unless within five days from the filing of this

opinion the parties can and do agree upon sufficient facts to enable us to enter a proper decree. Unless such an agreement is filed within the time above stated an order will be entered remanding the cause as above stated.

*W. L. Stanley* filed a brief for the trustees but did not argue.

*H. Edmondson* (*Henry Holmes* with him on the brief) for the minor respondents.

*L. J. Warren* (*W. O. Smith* and *Mott-Smith & Lindsay* with him on the brief) for the life tenants.